UNITED STATES of America

v.

Ephraim STERN, Defendant.

No. 02 CR 1015(GEL).

United States District Court,
S.D. New York.

Oct. 7, 2003.

Peter G. Neiman, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York), for the United States, of counsel.

Gerald L. Shargel, New York City (Marc Fernich, Danielle B. Shalov, Law Offices of Gerald L. Shargel); Arthur S. Friedman, for defendant Stern, of counsel.

## OPINION AND ORDER

LYNCH, District Judge.

In Dkt. No. 02 Cr. 1015(GEL), Ephraim Stern stands before the Court accused in a six-count Information, filed on August 1, 2002, of offenses including conspiracy to commit bank fraud and transport stolen property, bank fraud, money laundering and money laundering conspiracy. On January 21, 2003, he was separately indicted in Dkt. No. 03 Cr. 81(MBM) for making false statements to federal agents. In both cases, he has moved "to compel the Government to file a U.S.S.G. § 5K1.1 motion or, alternatively, to suppress all evidence derived from his cooperation." In the interests of efficient judicial administration, proceedings on the motion have been consolidated before me for decision in both cases. *See United States v. Stern,* Nos. 02 Cr. 1015(GEL) and 03 Cr. 81 (S.D.N.Y. July 6, 2003) (order granting consolidation). Following extensive briefing and an evidentiary hearing on September 3, 2003, the motion will be denied. This opinion will constitute the Court's findings of fact and conclusions of law relating to the motion.

### FINDINGS OF FACT

The following findings of fact are based on the testimony and exhibits received into evidence at the evidentiary hearing. As will be noted below, conflicting testimony was offered on certain points. In the interest of clarity, the Court's findings will be set forth in narrative form. On essentially all points, those findings derive from the testimony of Special Agent Michael C. McGarrity of the Federal Bureau of Investigation ("FBI"), whose testimony I found particularly credible, especially in contrast with that of defendant Stern, whose testimony on critical issues was unworthy of belief. Significant differences in testimony will be noted after the Court's findings, along with specific reasons for the Court's credibility determinations.

For some time prior to April 2002, McGarrity and other agents of the FBI and of the United States Customs Service were conducting an investigation of the laundering of Colombian drug money, the transportation of stolen checks to Israel, and other offenses. (Tr. 3, 9.)[1] The record

---

1. "Tr." refers to the transcript of the evidentiary hearing held on September 3, 2003.

before the Court in connection with other motions made by defendant discloses that the investigation was quite extensive, and involved electronic surveillance pursuant to judicial authorization in the United States and in Israel.

At approximately 8:00 a.m. on April 18, 2002, agents involved in the investigation arrested Stern. (Tr. 3, 7.) From the beginning, it was the agents' intention, with the concurrence of federal prosecutors, to seek Stern's cooperation in their ongoing investigation. (Tr. 30–32.) Accordingly, the arrest was effected with as much discretion as possible. (Tr. 14, 53.)

Stern was arrested near his home in Brooklyn by two investigators working with the FBI, who were instructed not to question him at all. Within less than a minute of the arrest, Stern was handcuffed and put into a car driven by McGarrity and Special Agent Danny Cahill (Tr. 4–5.) These agents also did not question Stern in any way, but took him directly to FBI headquarters in Manhattan. Although Stern was not questioned at this time, he was told that he was under arrest for various offenses including interstate transportation of stolen property, bank fraud and money laundering, and that he would be questioned later at the office. During the ride, and during the subsequent routine processing and taking of pedigree information, Stern did not request a lawyer or ask any questions. (Tr. 5–8.)

After this initial processing, Stern was taken to a debriefing room for questioning by McGarrity, Cahill and two Customs agents. The agents told Stern that before questioning him, they planned to tell them what they knew about him and what evidence they had, and that they intended to seek his cooperation. They advised him that they knew about his prior criminal record, that they had been wiretapping his cell phone for 90 days, and that they had already interviewed certain other members of the conspiracy. (Tr. 8–9.)

At the end of this recitation, the agents advised Stern of his rights and told him that they thought he would be in a good position to assist in the investigation. The agents specifically told him that it would be more useful to the investigation, and thus more beneficial to Stern, for him to cooperate immediately, since he would be able to make taped phone calls to co-conspirators right away before anyone knew he had been arrested. (Tr. 9–11.) Indeed, Stern himself acknowledged the essential truth of this observation, in that other conspirators were expecting phone calls from him that morning regarding their criminal projects, and that they would become suspicious if they did not hear from him as expected. (Tr. 77–78.) The agents specifically advised Stern that becoming involved in cooperation at this point would require him to testify against other people, and that he would have to be "on board a hundred percent" with that possibility. (Tr. 10.) The agents made clear that his cooperation would also be welcomed at a later stage in that "[s]ome people decide to cooperate later on and there are things they can do historically" (meaning, as the Court understands it, that they can provide "historical[ ]" testimony about past events), but that postponing the decision to cooperate would limit defendant's usefulness in "proactive" or undercover efforts because others would be aware of his arrest and because a defendant who was remanded to custody while awaiting trial would not be free to engage in undercover work. With respect to legal proceedings, the agents told him that the next step would be his arraign-

---

"GX" refers to Government exhibits received into evidence at that hearing. "[Date] Tr." refers to the transcript of proceedings on that date.

ment that day, but that if he decided to cooperate immediately he could waive that appearance. (*Id.*)

The evidence that Stern was advised of his *Miranda* rights and waived them is detailed. McGarrity so testified (Tr. 9, 11.) The FBI arrest log, signed by McGarrity, Cahill and the two Customs agents, reflects that he was advised of his rights both "verbally" and in writing at about 9:30 a.m. (GX 1.) Stern signed a written form headed "Advice of Rights," which accurately sets forth each of the four warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Indeed, the form elaborates on the right to counsel beyond what is minimally required by *Miranda*, informing Stern not only of his right to an attorney and to an appointed attorney if he could not afford one, but also of certain additional implications of that right:

> You have the right to talk to a lawyer for advice *before we ask you any questions.*
>
> You have the right to have a lawyer *with you during questioning.*
>
> If you cannot afford a lawyer, one will be appointed for you *before any questioning* if you wish.
>
> If you decide to answer questions now without a lawyer present, *you have the right to stop answering at any time.*

(GX 2; emphasis added.) Stern's signature appears following a recitation headed "Waiver of Rights" which states, I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present. (GX 2.) The form

is dated at the top at 9:30 a.m., and at the bottom at 9:46 a.m. (*Id.*)[2]

Upon being advised of his rights, Stern told the agents that "he wanted to have a clean slate, he wanted to go forward, be with us a hundred percent. He wanted to work with us." He did not ask for a lawyer or "say[ ] anything ... that suggested him speaking to a lawyer"; McGarrity knew that if he had, the questioning would have to cease. (Tr. 12.)

After this discussion, the agents presented Stern with another document, headed "Waiver of Speedy Presentment," which had been drafted or adapted by the United States Attorney's Office specifically for this case. (Tr. 12–13; GX 3.) This document, which was signed by Stern, acknowledges that Stern has been arrested for various federal offenses including conspiracy, interstate transportation of stolen property, and money laundering; again repeats the four standard *Miranda* warnings, including a detailed statement that Stern has the right to have an attorney "present at all stages of the criminal proceedings against [him]," and that he "need ... make no statements until such time as [he is] represented by counsel," including appointed counsel if necessary. It also advises Stern that he has a right "to be brought without undue delay" before a judge or magistrate, who would "[f]ormally advise [him] of the charges," determine whether there was probable cause to believe that he committed a crime, appoint a lawyer if necessary or "give [him] an opportunity to retain [his] own attorney," and determine whether he should be released on bail. (GX 3.)

2. The arrest log indicates that the routine arrest processing ended at 9:15. (Tr. 19; GX 1.) Since the waiver form was presented to Stern at 9:30 and signed at 9:46 (GX 2), the maximum time during which the agents transported Stern to the debriefing room, gathered together the four agents who would

participate in the interview, described their investigation, made their pitch for Stern's cooperation, advised him of his rights, and waited for him to read and sign the waiver form was no more than thirty minutes. (*See* Tr. 19–20.)

Finally, the waiver document recites that "I understand all of these rights and I hereby choose to waive my right to a speedy initial appearance before a . . . judicial officer," and that "I do so knowingly and voluntarily, and without any promise having been made to me, except that the prosecuting attorney in this case will be advised of the circumstances of any cooperation that I may provide." It also states that Stern understands that he will at some future time be presented before a Magistrate Judge on a complaint that charges a federal crime, and that an indictment of information charging such violations may also be filed. (GX 3.) The agents never had "any kind of discussion with Mr. Stern about how the charges against him would be disposed of," or "[a]ny plea discussion with him at all," and were not authorized by prosecutors to engage in any such discussions. (Tr. 65.) It was made clear to Stern, however, that one of the benefits of cooperation would be that he would likely get a better sentence if he cooperated. (Tr. 68.)

During and after reading this document, Stern again did not ask any questions or say anything suggesting a desire for a lawyer. To McGarrity, he appeared "somewhat . . . relieved" to be offered an opportunity to cooperate, "that he would not be going in front of the judge that day," and that he had been arrested outside the presence of his family. (Tr. 13–14.)

With the signing of these documents, Stern began a lengthy process of cooperating with the agents. The agents reported to an Assistant United States Attorney that they had succeeded in obtaining Stern's cooperation, contacting the prosecutor approximately once or twice in total during the day to advise him of their progress. (Tr. 46–47.) For the rest of that day, from before 10:00 to 5:00 or 5:30 p.m., Stern responded to the agents' questions and made consensually-recorded phone calls to other subjects of the investigation. Before making the phone calls, Stern signed yet another written waiver authorizing the recording of his conversations and stating that he has given this permission "voluntarily, and without threats or promises of any kind." (Tr. 14–15; GX 4.) In connection with the signing of this form, and before the agents returned Stern to his home at the end of the day, the agents advised Stern that his agreement to cooperate "doesn't postpone the process indefinitely, it just puts it off for a short period of time." Accordingly, they advised Stern that "he would have to eventually get an attorney." (Tr. 16.)

McGarrity's demeanor in describing this conversation made a particular impression on the Court. Asked why he told Stern that he would have to get a lawyer, McGarrity replied "Because he needs an attorney. He has been charged with something and he was arrested; he needs an attorney for initial appearance." (*Id.*) The agent's demeanor, which appeared totally candid and unaffected, made clear that he took the presence of an attorney for granted as an automatic attribute of the criminal justice process, and made plain that he did not regard it as notable or problematic that Stern would have access to counsel, at least from that moment on. He testified on cross-examination, similarly, that Stern would need an attorney not only for the arraignment, but also for "the cooperation agreement as well, because a cooperation agreement is needed for cooperation." (Tr. 59.) It was clear that McGarrity assumed that Stern would soon be represented by counsel, and that he did not regard such representation as a threat to his investigative goals or as something to be avoided. Stern's reaction, as reported by McGarrity, was equally matter-of-fact: "He just said okay." Stern did not suggest that he wanted an attorney

"right then and there to help him deal with" the agents. (Tr. 16.)

Over the next several days, Stern continued to report to the agents and to make phone calls. Ironically, it was not Stern but the agents who became increasingly insistent that Stern seek legal counsel. The agents had expected to present Stern to a judge or magistrate within a day or two of his initial arrest. Over the next several days, the agents repeatedly told Stern that "he need[ed] to retain a counsel. If he couldn't, we could set something up with the courts to see if he would get legal aid or someone. But we told him he had to retain counsel." (Tr. 17.) During this period, Stern continued to make phone calls and was "very cooperative," and never indicated "in any way, shape or form that he didn't want to [continue to cooperate] until he had gotten [a] lawyer retained." (Id.) The dynamic between the agents and Stern with respect to lawyers became almost comic: the agents, increasingly eager to institute the formal criminal process, repeatedly asked him, "are you ready, so we can tell the prosecutor[, d]oes he have an attorney so we can tell the prosecutor to schedule an initial appearance?" while Stern continued to put them off, saying that "he ha[d] been trying to get attorneys." but had not been successful.[3] (Id.)

Eventually, when the agents felt they could delay no longer, they brought Stern to court on April 26, 2003, eight days after his arrest. (Tr. 18; GX 1.) He had not yet retained an attorney, but the agents declined to delay the process any longer. Once again, McGarrity's tone and demeanor made clear his frustration and his matter-of-fact acceptance of the need for Stern to be represented and to be presented before a judicial officer: "Q. Why didn't you continue to wait for him to get an attorney? A. Because he had to be brought for initial appearance." (Tr. 17.)

At this point, since Stern "had still not retained an attorney," and told the agents, "he was unsuccessful in finding the right one," he was represented by Leonard Joy, Esq., the attorney-in-charge of the Federal Defender Unit of the Legal Aid Society, solely for purposes of the presentment and bail determination. Stern was released on a modest personal recognizance bond, and continued his cooperation. (Tr. 18; GX 1.) He continued to cooperate, and expressed no reluctance to do so despite his continued failure to retain counsel. (Tr. 18.)[4]

3. Stern has never claimed that he is unable to afford counsel of his choice, or that he ever made any such claim to the agents. With the exception of his initial presentment discussed below, he has been represented by retained counsel from the first appearance of any lawyer on his behalf, and he is represented by distinguished retained defense counsel at this time. There is no indication whatsoever in the record that Stern was inhibited by indigency from retaining counsel or that the agents ever believed or were led to believe that he was indigent. In any event, Stern had been advised orally and in writing at the time of his initial arrest of the availability of appointed counsel if he could not afford a lawyer (GX 2), and he was specifically reminded of the availability of "legal aid" during the period in which he remained at liberty pending presentment (Tr. 17).

4. Stern testified, as something of an afterthought to his direct testimony, that at the presentment he had a brief encounter with the Assistant United States Attorney in charge of the case, in which the prosecutor said, "[J]ust keep up the good work the way you are doing until now. Everything will be credited to you." (Tr. 93.) In the absence of contrary evidence, I credit Stern's testimony that such an encounter took place, and that the prosecutor made some remark in the nature of "keep up the good work," that is, expressing approval and/or encouragement of Stern's cooperation efforts. In view of Stern's general unreliability regarding matters of detail, the passage of over a year between the encounter and the hearing, and the somewhat unidiomatic nature of the words attributed to the prosecutor, which seem to reflect Stern's English diction rather than that of the prosecutor, Stern's testimony

This rather unusual period of cooperation in the absence of counsel or of any formal cooperation agreement went on for nearly two months. During this period, Stern never told the agents that he wanted a lawyer or that he wished to defer his cooperation until he had retained counsel: "Just the opposite, we kept telling him to get an attorney" (Tr. 22), and that he needed "to get a cooperation agreement ..., needed to get an attorney and get in and sit down with the prosecutor." (Tr. 63.) Moreover, during this period, and indeed at all times from his return home on April 18, 2002, until retained counsel appeared in the case in June (and indeed,

until his later second arrest for making false statements to the agents), Stern was at liberty and had free access to any lawyer he chose to consult. It appears, in fact, that he did meet with lawyers during this period, since he advised the agents "more than once" that he had retained counsel. (Tr. 20–21.) [5] Eventually, Arthur S. Friedman, Esq., appeared as counsel for Stern.[6] The record reflects his presence for the first time on June 17, 2002, when he and Stern met with prosecutors for a proffer session. (Tr. 21; GX 5.) After counsel had appeared, Stern continued to cooperate actively, including making undercover phone calls, outside counsel's presence but with counsel's consent. (Tr. 22.) [7]

does not support a finding as to any particular words, and I specifically do not find that any comment regarding "credit" was made.

5. Stern himself testified to various abortive efforts to retain counsel. (Tr. 87–90.)

6. McGarrity denied having a conversation with Stern about "who his lawyer should be." (Tr. 18–19.) It appears, however, that the agents were drawn into at least some conversations about Stern's choice of lawyer. McGarrity acknowledged that "[a]t one point we did tell him if he can't find one, we could obtain a list through the prosecutor's office to help him," but that was never actually done. (Tr. 19, 90.) He explicitly denied telling Stern that he needed to get a lawyer that "could be trusted," or that he wouldn't need an expensive or "big shot" lawyer. (Tr. 60.) Stern testified to the contrary (Tr. 89), and also testified that McGarrity told him that he should not retain a particular firm, because Stern had made phone calls to a co-conspirator from that firm's office and met with the co-conspirator there. (Tr. 90.) I find McGarrity's testimony more credible with respect to the subject of discouraging Stern from hiring a prominent lawyer. McGarrity was not specifically asked about discouraging Stern from hiring a lawyer who may have had a conflict of interest because of some involvement, innocent or otherwise, in the underlying facts of the case. Assuming arguendo that this conversation occurred, and assuming that it would have been better for the agents to avoid any conversations whatever concern-

ing Stern's choice of counsel, Stern was not prejudiced by any such conversation. He did not testify that he had any actual desire to retain a lawyer from the firm in question, only that he had "mentioned" the firm's name (Tr. 89), and it could not have been in Stern's interest to hire a potentially conflicted attorney. At any rate, it is undisputed that no government personnel played any part in recommending or selecting either Mr. Friedman or present defense counsel.

7. Stern had not been advised, at the time of his arrest or at any time, of his rights under the Speedy Trial Act for formal charges to be instituted within thirty days of his initial presentment. (Tr. 37–38; 39–40.) Colloquy at the hearing indicated that Stern may have intended to raise an issue with respect to whether and how that period was extended in the absence of an attorney for Stern in late May when this period expired. (Tr. 40–43.) Stern provided some confusing testimony that might be taken to imply that the Government had somehow caused an adjournment to be had without Stern's knowledge. (Tr. 90–91.) The Government undertook in open court to provide defense counsel with the relevant documents to permit additional briefing or inquiry if necessary. (Tr. 43.) No motion with respect to Stern's rights under the Act has been made either before or after the hearing. Although the record was left open for this and other purposes in the event additional discovery led the defendant to desire further briefing or testimony (Tr. 109–10), de-

Friedman continued to represent Stern through his eventual waiver of indictment in the present case on August 1, 2002, and his later arrest on charges of making false statements to the agents. He made a number of motions on Stern's behalf, which continued to be pressed by present counsel and which have been or will be dealt with in separate orders of this Court. No formal cooperation agreement between Stern and the Government was ever signed.

Stern's testimony was consistent with McGarrity's with respect to the overall course of events, but differed, as might be expected, on certain critical points. Stern testified that during the car ride to Manhattan, the agents advised him that he was under arrest, and began mentioning the names of people that Stern had been "dealing with." (Tr. 72.) Based on conversation among the processing agents (though apparently not on anything said directly to him), Stern believed that he was going to court immediately to be arraigned. (Tr. 73.) Stern confirmed that McGarrity began the interrogation or debriefing by stating that he had arranged to have Stern arrested quietly so that he could seek Stern's cooperation. (Tr. 74.) According to Stern, he stated that he would need time to think over that proposal. (Tr. 75.) McGarrity responded that Stern should be clear that he would not be permitted to leave without either going to court or reaching an agreement on cooperation. (Tr. 76.)

At this point, McGarrity's and Stern's accounts significantly diverge. Stern testified that he told the agents that "at least I need an attorney, I need to talk this over," before agreeing to cooperate. (Tr. 76.) He claims that the agents dissuaded him from consulting a lawyer, arguing that he

had to "make a decision fast" because once people knew he had been arrested, or even if he delayed in contacting the people in Colombia or Israel who were expecting to hear from him, he would be under suspicion, and his cooperation would lose value. (Tr. 77–78.) Stern testified that the agents told him that he wouldn't have to worry about his cooperation becoming known to others, because the other defendants would have no choice but to plead guilty, and because "everything is going to be sealed," and "your name is never going to appear." (Tr. 79–80.) In direct contradiction, McGarrity testified that while he told Stern that the agents would try to protect him, "I remember telling him that if he were to cooperate it would have to be a hundred percent," including that he "could be called to testify in court." (Tr. 55.) Furthermore, McGarrity specifically remembers telling Stern that "we would protect him as best we could but that his identity could be exposed because he would have to, there was a great possibility that he would have to testify." (Tr. 57.) On this point, it seems clear that there was a conversation in which the agents stated that every effort would be made to protect Stern's cooperation, but also that he had to be prepared to testify. It is not credible that the agents promised Stern that his name would never come out. Whether Stern misunderstood the more reassuring portions of the agents' remarks, or whether in retrospect he has intentionally or unintentionally exaggerated the significance of those remarks, the Court does not believe that such strong and misleading assurances were ever made.

Stern testified that "at least three to five times before 1 agreed to cooperate, that I kept pushing that I need an hour or two hours to get a lawyer, to talk to a lawyer."

fense counsel advised the Court in writing on September 8, 2003, that no additional inquiry was necessary. Accordingly, no issue under

the Speedy Trial Act is before the Court and no findings or conclusions relating to speedy trial issues are necessary or will be made.

(Tr. 85.) Each time, he claimed, the agents told him that "if we have to go that way, you are going first in front of the [j]udge, and at that time you will get an opportunity to call a lawyer or hire a lawyer, but it's going to be too late" to cooperate. (*Id.*) He insisted further that far from pressing him to get a lawyer, the agents told him a few days later that he would be arraigned on the following Friday, and that he wouldn't need a lawyer: "[D]on't worry, well get you a lawyer, you don't need." (Tr. 86.) Stern testified that he undertook on his own initiative to hire a lawyer, although he was initially unable to come to terms. (Tr. 87–89.) He did acknowledge, however, that at least after his presentment before the Magistrate Judge, the agents began to press him to hire a lawyer. (Tr. 91.)

I do not credit Stern's self-serving testimony that he requested a lawyer multiple times before agreeing to cooperate. McGarrity, who is a lawyer and former Manhattan assistant district attorney (Tr. 3), was well aware that he was required to stop questioning if Stern requested counsel. (Tr. 12.) Indeed, so was Stern, since that information was contained on the FBI waiver form that he signed. (GX 2.) Stern's demeanor during his testimony, and his description of his interrogation and cooperation, belied any contention that Stern was intimidated or confused during the discussions with the agents, and indeed he makes no such contention. Yet despite his repeated testimony after the fact that it was very important to him to consult a lawyer before making any decision (Tr. 99), he signed two different waivers of his right to see a lawyer within minutes of being requested to do so. (GX 2, 3.)[8]

Moreover, Stern's account of his alleged requests for counsel varied from telling to telling. In an affidavit in support of his motion, Stern said that he "repeatedly told [the agents], 'I'm not doing anything without talking to a lawyer.'" (Stern Supp. Aff., July 30, 2003, ¶ 7.) In this version, he stated that he gave in only after some 45 minutes of "pressure" (*Id.* ¶ 9), and that the agents "encouraged [him] to let them approve or veto my choice of counsel." (*Id.* ¶ 14.) In an earlier affidavit, Stern had provided no first-hand account, but endorsed the fact statement in his attorney's brief, which stated that he had told the agents, "in substance, 'maybe I should talk to a lawyer.'" (D. Supp. Mem. 3; Stern Aff., June 2, 2003.) His testimony at the hearing was less equivocal than the version in the brief, but not as emphatic as the version in his own affirmation. (Tr. 95.) These variations may not be particularly significant in themselves, but Stern's demeanor when confronted with the variations was telling. Stern shrugged off the variations, refused to commit himself, and made plain by his inflection and body language that he simply had no interest in precision or accuracy of expression. (Tr. 96–99; 100–04.)[9]

---

**8.** To the extent that portions of Stern's testimony could be taken to imply that he was willing to respond to interrogation by the agents without a lawyer, but subsequently balked at agreeing to cooperate actively with the agents before consulting counsel (Tr. 76, 100), any such claim is contradicted by Stern's own testimony that he repeatedly asked for counsel before signing the *Miranda* waiver (Tr. 101), and with McGarrity's credible and logical testimony that the agents made plain from the very beginning, even before giving *Miranda* warnings or proffering the waiver of rights form, that they were seeking Stern's cooperation. Stern's testimony wavered repeatedly when confronted with any inconsistency of detail. (Tr. 100–04; *cf.* D. Supp. Mem. 3.)

**9.** I have considered and reject the possibility that Stern's contradictions could be explained by the fact that his native language is Yiddish rather than English (Tr. 70), and that he has had little formal education in English (Tr. 105–06). Stern speaks English fluently, as his testimony reveals, albeit with an accent and

Finally, Stern's contention that he was vitally concerned to get the advice of counsel before agreeing to cooperate is completely inconsistent with his behavior in the days following his arrest. Even allowing for the possibility that Stern felt he had already irrevocably committed himself, it is inconceivable that someone as insistent as Stern claims he was about seeing a lawyer for advice about the wisdom of cooperation would fail, once at liberty, to take the opportunity to seek out a lawyer to ask whether he had made the right choice, whether his rights had been violated, and whether there was any way to recover if he had made a mistake. Instead, Stern apparently took no steps whatsoever for a week or more to obtain a lawyer, even when prodded by the agents to get one; made no effort to raise the issue with the lawyer who represented him at arraignment; [10] and allowed two months to go by with only the most desultory efforts to retain counsel. For all of these reasons, I find Stern's testimony regarding his purported requests for counsel unworthy of belief, and credit instead McGarrity's consistent, logical and forthright testimony that no such request was made.

## CONCLUSIONS OF LAW

Stern makes (implicitly or explicitly) a number of overlapping arguments concerning the events described above. The following strands can be separated out from his arguments, as presented variously, and with shifting emphases, in his initial memorandum of law supporting the motion, a supplemental letter-brief filed in reply to the Government's response, oral argument on July 24, 2003, comments of counsel during the evidentiary hearing, and oral argument on October 3, 2003, following the hearing.

First, he argues that any statement he made in response to interrogation by the agents (and, presumably, any incriminating conversations he engaged in at their behest) must be suppressed, in accordance with the rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because he made an unequivocal request for counsel after being advised of his rights, at which point all questioning and all efforts to persuade him to abandon his request for counsel were required to stop. (Def. Supp. Memo. at 3; Def. Supp. Lett. Brief at 3.) Second, he argues that even if he validly waived his Fifth Amendment right to silence and counsel after his arrest on April 18, an additional Sixth Amendment right to counsel attached when he was presented before the Magistrate Judge on April 26, and this right was never validly waived. (10/2//03 Tr. 5–7.) Third, he contends that his statements to the agents should be suppressed pursuant to Rule 410, Fed.R.Evid., because they constituted statements made during plea

occasional grammatical errors. As noted in the text, from observing Stern's demeanor it is clear to me that the problem is not lack of appreciation of the differences of nuance between various accounts, but a lack of interest in being anything more than at best approximate with the truth.

10. Stern's testimony that he was told that Mr. Joy would represent him only for purposes of the proceeding before the Magistrate Judge, apparently because Stern was not financially eligible for appointed counsel, is consistent with normal practice and I therefore credit it.

But Stern does not claim that he made any effort to ask Mr. Joy whether he should seek a lawyer promptly or whether his decision to cooperate had prejudiced him. Again, it is entirely incredible that a defendant who thought it was vital to consult a lawyer about the wisdom of cooperating and repeatedly insisted on the point to law enforcement agents would meekly accept the statement that counsel was only appointed for purposes of the presentment, or would take that statement as precluding him from asking the lawyer a single question about a subject he regarded as critical.

negotiations. (Def. Omnibus Mot. at 18–20; Tr. 50; 10/2/03 Tr. 3–4.) Fourth, he argues that any waiver of his rights he may have made was not knowing and intelligent because it was extracted from him by inaccurate or misleading information provided by the agents. (Def. Supp. Mem. at 2, 8–9; Def. Supp. Lett. Brief at 3–6; 7/24/03 Tr. 11–13.) Fifth, he appears to argue that the dangers (physical, social and legal) of cooperation are such that an agreement to cooperate without the advice of an attorney and without a detailed written cooperation agreement is null and void. (Def. Supp. Mem. at 2, 6–14; 7/24/03 Tr. 15–16; 10/2/03 Tr. 12–16.) Sixth, he argues that even if such an uncounselled agreement to cooperate is not completely ineffective to the extern of requiring suppression of any statements made in furtherance of it, he should be treated as if he had a written agreement, a conclusion that he seems to believe would entail his entitlement to a motion for a downward departure pursuant to U.S.S.G. § 5K1.1. (Def. Supp. Lett. Br. at 1–2; Def. Supp. Mem. at 2–3, 13–14.)

## I. *Edwards v. Arizona*

 An arrested suspect, under the Fifth Amendment as interpreted in *Miranda,* has a right to silence and a limited right to counsel to protect that right. Under *Edwards,* "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880. Stern's *Edwards* claim must be rejected on the basis of the factual findings set forth above. Since I find as a matter of fact that Stern did not request a lawyer at any time during his interrogation on April 18, and freely and voluntarily waived his rights to

silence and to counsel, there was no violation of *Miranda* or *Edwards* in his continued interrogation.

## II. *Sixth Amendment Right to Counsel*

 In contrast to the Fifth Amendment right to silence and its correlative right to counsel, it is "firmly established that a person's Sixth . . . Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The point of "initiation of adversary judicial criminal proceedings" has been variously identified as "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689, 92 S.Ct. 1877. *See also United States v. Gouveia,* 467 U.S. 180, 187–88, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (confirming this analysis). Stern argues that his appearance before the Magistrate Judge constituted an "arraignment" at which the Sixth Amendment right attached, that the Sixth Amendment right to counsel is more difficult to waive than the Fifth Amendment right to silence, and that he never waived his Sixth Amendment right to counsel.

The first of Stern's premises is questionable. Stern contends that his appearance before the Magistrate Judge was an "arraignment" at which the Sixth Amendment clearly attached under *Kirby.* But although the term "arraignment" is widely used by lawyers to refer to the magistrate's proceeding following an arrest, that usage is imprecise. The Federal Rules of Criminal Procedure reserve the term for a post-indictment proceeding, *see* Rule 10, Fed.R.Crim.P., and do not use the term in reference to the initial presentment of an arrested person before a judicial officer, using the term "initial appearance" or "appearance upon an arrest" instead. *See*

Rule 5 and Rule 5(a)(1), Fed. R. Crim P. Black's Law Dictionary similarly defines an arraignment as "[t]he initial step in a criminal prosecution whereby the defendant is brought before the court to hear the charges and to enter a plea." Black's Law Dictionary (7th Ed.1999). The defendant is not required to respond to the charges at the initial appearance before a magistrate.

These sources, of course, do not control the meaning of the term as it is used in the Supreme Court's Sixth Amendment decisions. Those decisions are less than clear, however, and the Court has never clearly defined its meaning. In *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the modern root of the Court's Sixth Amendment jurisprudence, the term clearly refers to a post-indictment procedure of the sort described in Rule 10. However, in *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Court discussed the contours of a Sixth Amendment right to counsel after an "arraignment" that, it seems clear from the underlying decision of the Michigan Supreme Court, was more analogous to a magistrate's proceeding under Rule 5. *See People v. Bladel*, 421 Mich. 39, 365 N.W.2d 56, 59–63 (1984).[11] The Second Circuit has questioned whether the "initial appearance before a magistrate," which "reflects an earlier stage of proceedings against the accused" than the "post-indictment and post-arraignment circumstances" in which the Sixth Amendment right had previously

been recognized, might implicate different rights, but it did not decide the issue. *United States v. Smith*, 778 F.2d 925, 932 (2d Cir.1985). At least two subsequent Second Circuit cases, however, appear to treat a Rule 5 presentment as an "arraignment" at which the Sixth Amendment right to counsel attaches, although neither case directly addresses the issue.[12] It is not clear that the presentation before the magistrate, which is largely concerned with the legality of the suspect's arrest and the terms on which the suspect will be held or bailed pending a preliminary hearing or grand jury proceeding, represents the point at which "the government has committed itself to prosecute." *Kirby*, 406 U.S. at 689, 92 S.Ct. 1877.

But for purposes of the present case, it can be assumed that Stern's Sixth Amendment right had attached, because Stern's second premise is wrong. Although Second Circuit law was once to the contrary, *United States v. Mohabir*, 624 F.2d 1140, 1153 (2d Cir.1980), the Supreme Court has expressly rejected the view that "waiver of an accused's Sixth Amendment right to counsel should be more difficult to effectuate than waiver of a suspect's Fifth Amendment rights." *Patterson v. Illinois*, 487 U.S. 285, 297–98, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (internal quotation marks omitted). The Second Circuit has recently reaffirmed that the attachment of the Sixth Amendment right to counsel "does not preclude a defendant from waiv-

**11.** The applicability of the Sixth Amendment was apparently not challenged in *Jackson*, and the Court simply assumed that the Sixth Amendment applied and proceeded to decide that the same strict rule of *Edwards*, that all police questioning must cease upon invocation of the right to counsel, applied in the Sixth Amendment context as in the Fifth.

**12.** In *United States v. Abdi*, 142 F.3d 566, 569–70 (2d Cir.1998), the procedural context of the "arraignment" there is unclear and the

issue is not explicitly discussed. In *United States v. Edwards*, 342 F.3d 168 (2d Cir.2003), the Court considered on the merits a Sixth Amendment challenge to the admission of statements made after an "arraignment" by which the Court clearly means an initial appearance before a magistrate. *See id.* at 181–82 (discussing claim), 174–75 (describing timing of statement). Again, however, the applicability of the Sixth Amendment seems to have been assumed by all parties.

ing his right to counsel." *United States v. Yousef,* 327 F.3d 56, 140 (2d Cir.2003). "Rather, as the Court in *Jackson* held, it is the defendant's *invocation* of his right to counsel that vitiates the validity of a waiver subsequently obtained during a government-initiated interrogation." *Id.* at 141 (emphasis in original), citing *Jackson,* 475 U.S. at 635, 106 S.Ct. 1404.

Here, even assuming that as of April 26 Stern had a right to counsel under the Sixth Amendment as well under the Fifth, there is no basis for a conclusion that he *invoked* that right, or that he did not validly waive it. Stern has been advised of his *Miranda* rights and waived them; he did not at any time ask for a lawyer; he failed to retain counsel or seek to defer the cooperation he had agreed to undertake until after he consulted counsel, even after being advised by the Magistrate Judge of his right to counsel, *see* Rule 5(d)(1)(B), Fed.R.Crim.P., and repeatedly urged by the agents to obtain a lawyer. There can be no clearer example of a waiver of the right to counsel.[13] Accordingly, Stern's claim that his Sixth Amendment rights were violated must be rejected.

## III. *Rule 410, Federal Rules of Evidence*

Rule 410, Fed.R.Evid., renders inadmissible against any defendant who "was a participant in . . . plea discussions," several categories of statements, including (as relevant here) "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty." *See also* Rule 11(f), Fed.R.Crim.P. (same). Our Court of Appeals has had occasion to discuss the applicability of this rule to situations in which an arrestee makes statements to police officers or other law enforcement agents in an apparent effort to secure leniency.

No decision of the Second Circuit has ever found Rule 410 applicable to exclude post-arrest statements made by an arrestee whose cooperation was solicited by the arresting agents. Stern cites *United States v. Levy,* 578 F.2d 896 (2d Cir.1978), which found the then-existing version of Rule 410 inapplicable to the circumstances before the Court, in which an arrestee had made incriminating statements in the unexpressed hope of receiving leniency. The *Levy* Court, however, appeared to contemplate in dictum the possibility that statements solicited by agents in conversations in which leniency was expressly discussed might be covered by the Rule. 578 F.2d at 901. But that possibility was not before the Court in *Levy,* and the Court did not purport to say, even in dictum, how such a case should be decided. More importantly, whatever significance these dicta might once have had, they have been superseded by later events and are no longer relevant. As the Second Circuit has frequently recognized, subsequent to *Levy,* Rule 410 was amended specifically to make clear that its exclusionary rule "appl[ies] only to statements made to prosecuting attorneys," not to agents. *United States v. Lawson,* 683 F.2d 688, 691 (2d Cir.1982). *See also United States v. Baker,* 926 F.2d 179, 180 (2d Cir.1991) (Rule 410 "limits the statements excluded to those made to an 'attorney' for the government").

---

**13.** Stern does not argue that the agents needed to re-advise Stern of his *Miranda* rights on each occasion that they met with him, either before or after his appearance before a magistrate. Stern was not in custody after his initial arrest on April 18, and he had agreed on that occasion not only to answer questions but to engage in on-going cooperation. Absent a later invocation of his right to silence or to counsel, there was no reason for the agents to undertake additional steps to secure further waivers on each subsequent occasion that they interacted with Stern.

In this case, as found above, virtually all of Stern's contacts were with agents of the FBI. Before the proffer session on June 17, 2002, Stern's only direct contact with the prosecutor was a somewhat innocuous and inconsequential comment approving of Stern's efforts made at the time of his arraignment, which certainly does not qualify as a "plea discussion." Stern attempts to construe the initial discussions following Stern's arrest as "plea discussions with a [prosecuting] attorney" by emphasizing McGarrity's testimony that the prosecutor had approved the plan to seek Stern's cooperation, that he reported "once or twice" to the prosecutor on the progress of those efforts on the day of the arrest, and that the prosecutor had prepared the document by which Stern waived presentment. But none of these facts, taken singly or together, is sufficient to render Stern's interrogation or cooperation "plea discussions with" the prosecutor.

First, the discussions did not involve the terms of any plea. Surely, Stern expected to receive leniency of some form as a result of his cooperation, and McGarrity candidly admitted, as he could not credibly fail to do, both that the likelihood of such leniency was the underlying theme of the entire presentation to Stern and that it was implicit or explicit that Stern would ultimately have to take some kind of plea. However, McGarrity also testified credibly, and Stern acknowledged in writing, that no promises were made to him of any specific treatment "except that the prosecuting attorney in this case will be advised of the circumstances of any cooperation." (GX 3.) The agents' pitch to Stern to cooperate was a standard exhortation that did not cross the line into a "plea discussion."

Second, the discussions were not even indirectly with "an attorney for the prosecuting authority." The involvement of the prosecutor in discussing in advance with the agents the plan to seek Stern's cooper-ation was typical of prosecutorial involvement in an on-going investigation, in which agents and prosecutors collaborate in undertaking complex criminal investigations. *See* Daniel Richman, *Prosecutors and Their Agents. Agents and Their Prosecutors,* 103 Colum. L.Rev. 749, 778–80 (2003). The prosecutor did not dictate or even approve any particular tactics utilized by the agents, but consulted only in the general plan of seeking to secure Stern's cooperation. McGarrity's contact with the prosecutor during the day was only minor, and did not involve the prosecutor's controlling or directing the efforts of the agents, but only McGarrity's reporting to the prosecutor on the success of the venture. After April 18, the only comments of the prosecutor to the agents to which Stern testified were relayed to him by the agents concerned the need for Stern to get a lawyer. (Tr. 91.) The agents also repeatedly told Stern that he needed to get a lawyer so that the *lawyer* could be put in touch with the prosecutor (Tr. 60) or "get in and sit down with the prosecutor" (Tr. 63) in order to negotiate the terms of a cooperation agreement (Tr. 62). Given these facts, it is clear that the agents, Stern, and the prosecutor all understood and intended that any plea negotiations with the prosecutor would take place only with the attorney that Stern was constantly being urged to retain.

Third, the behavior of the parties after Stern retained an attorney confirms this understanding of the process. Attorney Friedman's first act was to contact the prosecutor and arrange a proffer session, subject to a "queen for a day" proffer agreement. (GX 5.) Such a proffer interview involving the prosecutor, defendant and defense counsel is the conventional first step in attempting to negotiate the terms of a plea/cooperation agreement. The agreement in this case, which is in the standard form used by the United States

Attorney for the Southern District of New York, *see* Federal Bar Council Committee on Second Circuit Courts, Federal Bar Council, *Proffer, Plea and Cooperation Agreements in the Second Circuit,* App. D–21–D26, (2003), implicitly recognizes that statements made during such a session ordinarily *would* be covered by Rule 410, by expressly including a waiver of the rule's protection under certain circumstances. (GX 5 at ¶ (5).) *See also United States v. Mezzanatto,* 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995) (recognizing validity of such waivers).

As the Second Circuit has held, whether a party is engaged in plea negotiations is a fact question to be decided on a case-by-case basis. *United States v. Serna,* 799 F.2d 842, 848 (2d Cir.1986). The facts of *Serna* are illustrative of the circumstances in which a statement to an agent might be construed as in fact occurring during plea negotiations with a prosecutor. There, the defendant had entered formal plea discussions with the prosecutor by meeting with an Assistant United States Attorney and two DEA agents, accompanied by his at-torney. The meeting in which the prosecutor participated was limited to discussing the ground rules for cooperation, and the defendant was then turned over to the agents for a debriefing, still in the presence of his attorney. The interview was explicitly contemplated as a proffer (unsuccessful, as it developed) to evaluate the defendant's cooperation for purposes of deciding whether a favorable plea offer would be made. *Id.* at 848–49. This is a far cry from the informal discussions, conducted without attorneys on either side and without explicit negotiation (indeed, with both written and oral disavowals of any specific promises of any kind) that occurred here.

For all of these reasons, the Court concludes that Rule 410 does not require suppression or exclusion of Stern's statements or conduct while cooperating with the agents.[14]

## IV. Deceptive or Misleading Statements to Elicit Waiver

Like any arrested defendant subjected to custodial interrogation, Stern had an

---

**14.** It could be argued, on the strength of *Serna,* that any statements or cooperation extended by Stern after Mr. Friedman entered the case and commenced plea negotiations commenced would come under the umbrella of the plea negotiations that were unquestionably in progress between defense counsel and the prosecutor from that point on. *See United States v. Ming He,* 94 F.3d 782 (2d Cir.1996) (cooperating witness has right to presence of attorney at debriefing interviews absent waiver by counsel or defendant). However, McGarrity testified without contradiction or cross-examination, and I find, that Mr. Friedman expressly authorized the agents to continue to meet with Stern outside the presence of defense counsel for purposes of continuing his cooperation. (Tr. 22.) Under all the circumstances of the case, I find that it was contemplated by the parties that these meetings, none of which, so far as the record reveals, involved the prosecutor, would continue on the same terms as the prior meetings with the agents, and that, unlike the state-ments made during the proffer session itself, Stern's continued involvement with the agents, which primarily consisted of conducting undercover operations, were not understood by any of the parties to be, and were not, statements "in the course of plea negotiations." (The Government has represented, without contradiction, that the initial proffer agreement was expressly extended to cover all sessions at which the lawyers were present. 10/2/03 Tr. 34. This procedure was evidently not followed with respect to sessions solely between Stern and the agents for purposes of active cooperation. *Id.*) At any rate, except for an argument that statements during this period should be excluded because they are tainted by alleged prior illegality (Def. Supp. Lett. Br., July 15, 2003, at 6), Stern makes no argument specifically directed to these statements, and in particular does not argue that these statements specifically (as distinguished from the statements before Mr. Friedman entered the case) were uniquely subject to Rule 410.

absolute right not to answer questions put by the agents, let alone to engage in proactive cooperation. *Miranda,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. It is thus critical to the admissibility of any of his statements following his arrest that he freely and voluntarily waived his rights. While Stern undoubtedly agreed to waive his rights and speak to the agents (GX 2), such a waiver would not be valid if it was extracted by coercion or deceit. 384 U.S. at 476, 86 S.Ct. 1602. As the Supreme Court emphasized in *Miranda,* "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Id.; see also United States v. Male Juvenile,* 121 F.3d 34, 41 (2d Cir.1997) (defendant may not be "misled" into waiver, "thus denying him any rational choice of whether to waive his rights and confess"); *United States v. Mitchell,* 966 F.2d 92, 100–01 (2d Cir.1992) (waiver voluntary where plaintiff failed to demonstrate fraud on the part of government agents as to the nature of the investigation); *United States v. Duvall,* 537 F.2d 15, 24 (2d Cir., 1976) (waiver coerced where defendant was jailed overnight, not arraigned for over 20 hours, and threatened by prosecutor that he would go to prison for 100 years). Government agents are not permitted to elicit consents and waivers from suspects by tactics of deception.

■ Stern contends that the agents did that here, by deceiving him about the need for him to cooperate immediately to enjoy the benefits of cooperation, and about the likelihood that his cooperation would be disclosed to his co-conspirators. However, in order to prevail on this claim, Stern has the burden of proving that the agents affirmatively misled him, and further, that their affirmative misrepresentations induced him to make inculpatory statements. *Mitchell,* 966 F.2d at 100. Stern has failed to meet this burden: as the above recita-

tion of the facts makes clear, the agents did not deceive Stern.

First, the agents did not deceive Stern with respect to the urgency of cooperation. As found above, McGarrity's account of the assertions made by the agent is more credible than Stern's. Even Stern's testimony itself stops short of actually claiming that the agents told him that he would have to cooperate then or never. He testified that the agents told him that "if people get to know what's going on, you are not going to be helpful," and that "you are going to have to make a decision fast because at this time usually you are already calling people and you have to call these people." (Tr. 77.) The closest his testimony comes to suggesting an ultimatum that later cooperation would be rejected is the statement that sometimes people who are arrested "don't talk and once they're in there they're ready to talk, but at that time it doesn't mean nothing to us, we can't do it anymore." (*Id.*)

But McGarrity's more coherent and credible account of the conversation, which the Court accepts as true, describes the agents as expressly acknowledging that later cooperation would be possible and could be of assistance, but that cooperation that came after some delay, and particularly after a defendant was in custody, would likely be less useful because they would by that time not be able to engage in "proactive" undercover work. (Tr. 10.) This statement is entirely accurate. Although the record as to Stern's activities on behalf of law enforcement is limited, both Stern's and McGarrity's testimony make clear that most of his time with the agents was spent making telephone calls and in other active projects to collect evidence against other members of the conspiracy, and not in lengthy debriefings about past events. Thus, it is apparent that the agents were truthful in advising Stern that his most

valuable use as a cooperator was in such undercover work to expose and document ongoing crimes, and not as a credible witness to past criminal acts. It was also true that his value in this regard was time-sensitive. As Stern himself acknowledged, there were in fact individuals waiting to hear from him on the day of his arrest. (Tr. 78.) Thus, the agents' assertion that his cooperation would likely be less valuable if delayed by lengthy negotiations was, on the facts of this case, completely correct. Since the agents had legitimate and accurate arguments for urgency, there was no reason for them to go beyond the truth and insist that there would be no later opportunity to cooperate, and there is no credible evidence that they did.

Second, the claim that the agents misled Stern about whether his cooperation would become known to others is also unsupported by the record. Stern testified that he expressed some concern for his safety, and even more for the prospect that he would be "embarrassed" in the orthodox Jewish community in which he lived, and that the agents proceeded to reassure him that his name was "never going to appear." (Tr. 79–82.) [15] McGarrity testified, however, that Stern essentially jumped at the chance to cooperate, had no reluctance or hesitation about doing so, and appeared "relieved" to be given the opportunity. (Tr. 13.) As found above, what the agents actually told him was that "we would protect him as best we could but that his identity could be exposed because he would have to, there was a great possibility that he would have to testify." (Tr. 57.)

There was no inaccuracy or deceit in what the agents told him. Because "inculpatory statements are not involuntary merely because they are made in response to official requests to cooperate," *United States v. Mast,* 735 F.2d 745, 750 (2d Cir.1984), and because the agents did not mislead Stern, his claim of deceit must be rejected.

## V. *Failure to Warn of the Dangers of Cooperation*

Closely related to the claim that Stern was misled about the dangers or risks of cooperation is the claim that his agreement to cooperate was involuntary and invalid because it was not preceded by consultation with an attorney, or by warnings from the agents themselves about the dangers of cooperation. This claim must be distinguished from the claims, rejected above on factual grounds, that the agents violated Stern's rights by continuing to question or pressure him after he invoked his right to counsel, or induced him to waive that right by affirmatively misleading him in some way. Stern appears, in addition, to make the separate claim that more than ordinary *Miranda* warnings are required before a defendant can validly agree to cooperate more actively with the authorities, either by receiving some fuller account from the agents of the legal and other dangers of cooperation, or by being afforded an unwaivable opportunity to consult with counsel. (10/2/03 Tr. 12–16.) Stern cites no authority for the proposition that an uncounseled agreement to cooperate should be treated as invalid. This is not surprising, since such a proposition

---

**15.** The notion that Stern's career as a money launderer would be a matter of indifference to his co-religionists, but that cooperating with the authorities to apprehend criminals who happened to be Jews would cause them to ostracize him, verges on being an anti-Semitic slur. But whatever Stern may have been thinking at the time, and however concerned he might have been about his safety or about being shunned in his community, I find based on McGarrity's credible testimony that Stern did not share these concerns with the agents, at least not to the extent he claimed in his hearing testimony to have done, and that there was accordingly no occasion for the excessive and unrealistic promises of secrecy that he claims were made to him.

would be inconsistent with basic constitutional principles.

It is a fundamental proposition that constitutional rights, including the right to silence and the right to counsel, can be waived if the waiver is knowing and voluntary. *Peretz v. United States*, 501 U.S. 923, 936–37, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991); *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Even in the "inherently coercive" context of a post-arrest custodial interrogation, a properly-warned defendant may waive these rights and make a voluntary decision to forego consultation with counsel and confess to the authorities; that is the basic holding of *Miranda*.

If a defendant can waive his rights to counsel and silence, based on his own assessment of his interests and without the advice of a lawyer, for the purpose of confessing his guilt and throwing himself on the mercy of the authorities, it is difficult to understand the proposition that the agreement to cooperate with the authorities, which holds the potential for a more favorable legal outcome than a confession without cooperation, requires additional warnings or a lawyer's advice.

It is unclear, at any rate, to what dangers Stern believes a lawyer would have or the agents should have alerted him. The risk of further self-incrimination through cooperation is identical to the risk of full confession, which, as noted, can be undertaken by a defendant without counsel and with only the basic *Miranda* warnings that Stern received. The principal risk to which Stern calls attention is the risk that a cooperator could incur even greater legal troubles by misleading the agents (or appearing to do so), or by committing further crimes. (10/2/03 Tr/ 13–14.) Putting aside any argument that this risk should be obvious to anyone,[16] any failure to warn Stern about this caused him no prejudice, first, because Stern, as he admitted himself on cross-examination, was aware from the beginning that "if [he] lied to the government when [he was] trying to cooperate, that would have a very bad consequence for [him]" (Tr. 105), and second, because this risk did not become reality until well after he obtained the advice of counsel, who surely advised him of precisely these risks.

As far as the physical dangers of cooperation, Stern's own testimony reveals that he needed no advice from a lawyer or FBI agent to be aware of those. Absent misleading statements by the agents that exaggerated the possibilities of protection—and I find above that there were none—the agents or a lawyer could have told Stern little or nothing that he did not already know.[17] In sum, Stern essentially claims that, even absent any deceit by the agents, he was entitled to receive some fuller warning of the dangers of cooperation, or that a defendant who has been

---

**16.** Stern argues that what might *not* be obvious to anyone, or even to someone who knew that lying would lead to "a very bad consequence" (Tr. 105) is that misleading the Government would not only get him in deeper trouble, but that doing so could lead to his being denied *any* benefits from his cooperation. (10/2/03 Tr. 14–15.) But Stern *was* advised by the agents, right from the very start, that he was not being guaranteed *any* particular leniency, and that he was being promised nothing more than that his cooperation would be brought to the prosecutor's attention. (GX 3.) He thus was perfectly aware that he had no "vested" right to any particular benefit at all, and thus can hardly claim that he should have been specifically warned as to every circumstance that might lead the prosecutor to evaluate his behavior negatively.

**17.** Indeed, to the extent that Stern's testimony suggests that his primary fear was of ostracism from his religious community, neither the agents nor most lawyers could be expected to know as much about this risk as Stern himself.

properly advised of his rights and waived consultation with counsel nevertheless cannot agree to cooperate without having actually consulted with counsel. This claim is rejected as a matter of law.

## VI. *Right to a Motion Pursuant to U.S.S.G. § 5K1.1*

Finally, Stern argues that in view of his extensive cooperation, and given the somewhat anomalous circumstance that he was permitted to cooperate for many weeks without an attorney's advice, and for many months without a formal cooperation agreement, he should be treated as if he had such an agreement, and the Court should compel the Government to make a departure motion pursuant to U.S.S.G. § 5K1.1 on his behalf. This claim is both premature and without merit.

First, Stern's claim that his cooperation should entitle him to a "warts and all" 5K1 letter (*see* Def. Supp. Mem. at 2, 6; Def. Supp. Lett. Br. at 1) is premature. Stern has not pled guilty to or been found guilty of the charges pending against him, and therefore continues to be presumed innocent of those charges. Indeed, since Stern remains unconvicted of any crime, the Government has not even had occasion to decide with finality whether it will make a motion for departure on the basis of his earlier cooperation. If Stern were to be acquitted, or if the Government were to have a change of heart after any conviction, any discussion by this Court at this stage of the proceedings of Stern's entitlement to such a motion would be rendered entirely hypothetical. Therefore, any

question about whether he will be entitled to a sentencing departure if he eventually pleads guilty or is convicted at trial is not yet ripe.[18]

Second, it must in any event be noted that the claim that Stern should be treated as if he had a cooperation agreement would not entail the relief Stern seeks. Negotiations looking toward such an agreement were apparently under way from the time Mr. Friedman appeared as counsel for Stern in June 2002 until Stern's arrest on false statement charges in December, 2002. Stern has not claimed that the failure to reach agreement during this period resulted from any misconduct by the Government. Certainly, the failure to reach a plea and cooperation agreement during this period cannot be attributed to any wrongdoing of the agents between April 18, 2002, and June 17, 2002, even assuming contrary to fact that such wrongdoing had been shown. It is not for the Court to create a plea agreement out of whole cloth, or impose one on parties who had not come to terms. Moreover, whatever plea agreement the parties might have reached would inevitably have contained provisions, invariant in the standard cooperation agreements of both the Southern and Eastern District United States Attorneys' Offices, that the Government can revoke the agreement and take back all its promises if the cooperator violates his or her commitment to the Government to tell the truth and to avoid additional crimes. That is exactly what the Government claims in this case. Accordingly, to treat Stern as if he had a written coopera-

---

**18.** Moreover, Rule 11(c)(1), Fed.R.Crim.P., forbids the Court to participate in any plea discussions. It would be improper for the Court to indicate what sentence should be imposed if Stern should enter a guilty plea, or what agreement, if any, the parties should reach. It would be even more improper for the Court to attempt to induce a plea by speculation about what sentence would be

imposed should the defendant plead guilty, or to anticipate the questions that might arise at sentencing if Stern should be convicted after a trial. Whatever may be true in the Court of the Red Queen, on this side of Alice's Looking Glass, we have the trial first and the sentence after (and only if the defendant is found guilty), not the reverse.

tion agreement would not require the Government to give Stern a 5K1 letter, at most, it would require inquiry into whether Stern in fact committed such misconduct.

Notably, Stern has made no allegation that the Government's present disinclination to file a departure motion is based on an unconstitutional motivation or has been reached in bad faith. *Cf. Wade v. United States,* 504 U.S. 181, 186, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992) (recognizing courts' authority to review prosecutorial decisions not to seek departure from sentencing guidelines for unconstitutional motives).[19] The time to review any such claim, if one ever should be made, would be after conviction, and after the Government has finally made its decision whether to seek a departure.

## CONCLUSION

For the foregoing reasons, Stern's motion to suppress the statements made during the period of his cooperation, or to require the Government to make a departure motion pursuant to U.S.S.G. § 5K1.1, is denied.

19. Defense counsel's references to "bad faith" at oral argument, in context, appear to be based on the notion that the Government's alleged violations of Stern's rights discussed above constituted Government "bad faith" that would permit the Court to require the filing of a motion under § 5K1.1. (10/2/03 Tr. 10–12.) But that is not the apparent meaning of "bad faith" in the context of *Wade.* There, the Supreme Court was concerned to provide a remedy in the event a defendant had provided substantial assistance, but the Government declined to make a motion for irrelevant or discriminatory reasons. 504 U.S. at 186, 112 S.Ct. 1840. Here, the Government contends that its decision not to enter a cooperation agreement with Stern is based on the conclusion that he has committed a "crime related to dishonesty that casts so much doubt on [him]" that he is no longer a valuable cooperator: "From our point of view, here was a guy who was saying he was getting money from a particular person and it turned out he was not getting money from that particular person. Well, that is a pretty bad lie." (10/2/03 Tr. 29.) Stern has never argued that this belief on the part of the Government is not held in good faith, or that it is a pretext for some other, invidious or discriminatory, reason to deny Stern the benefits of cooperation. (*See* 7/24/03 Tr. 16 ("what he did by lying to the agents was so egregious that there is no court in that land that would have said, You acted in bad faith, give him a 5K letter").)