UNITED STATES of America, Appellee,

v.

Jorge SERNA and Steven John Cinnante, Appellants.

Nos. 1202, 1223, Docket 86–1003, 86–1008.

United States Court of Appeals, Second Circuit.

Argued May 2, 1986.

Decided Aug. 25, 1986.

Lawrence M. Malman, P.A., Coral Gables, Fla. (Stephen Golembe, Mishkin & Golembe, Miami, Fla., of counsel), for appellant Jorge Serna.

Paul J. Cambria, Jr., Buffalo, N.Y. (Mary Good, Lipsitz, Green, Fahringer, Roll, Schuller & James, of counsel), for appellant Steven John Cinnante.

Ephraim Savitt, Brooklyn, N.Y. (Reena Raggi, U.S. Atty., E.D. of New York, Allyne R. Ross, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, Chief Judge, and LUMBARD, and OAKES, Circuit Judges.

OAKES, Circuit Judge.

Appellants Jorge Serna and Steven John Cinnante appeal their convictions following a jury trial in the United States District Court for the Eastern District of New York, Thomas C. Platt, Jr., Judge, in connection with the importation into the United States from Colombia of 4,920 pounds of marijuana in March of 1984 and the distribution of cocaine. Count One of the indictment charged Serna and Cinnante with conspiring to import, possess, and distribute marijuana and to possess and distribute cocaine in violation of 21 U.S.C. § 846 (1982); Count Two charged Serna with directing the importation of the marijuana in

violation of 21 U.S.C. §§ 952(a), 960(a)(1) (1982) and 18 U.S.C. § 2 (1982); Count Three charged both Serna and Cinnante with the crime of possession of marijuana with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2. Each defendant was found guilty on all counts charged. Judge Platt sentenced Serna to concurrent twelve-year terms of imprisonment on Counts One and Two and a concurrent five-year term on Count Three, to be followed by concurrent lifetime special parole terms, as well as a cumulative fine of $65,000; Cinnante was sentenced to a twelve-year prison term on Count One and a concurrent ten-year prison term on Count Three, to be followed by a concurrent lifetime special parole term, and a cumulative fine of $80,000. Appellants challenge four evidentiary rulings of the trial court. Cinnante also claims that the evidence was insufficient to support his conviction and that the trial court should have granted his motion for a new trial on the basis of newly discovered evidence. We affirm.

## BACKGROUND

On March 13, 1984, United States Customs inspectors at the Brooklyn seaport discovered sixty-eight bales of marijuana weighing about two and one-half tons secreted inside a false compartment of a shipping container loaded with furniture that arrived aboard a vessel from Colombia. According to the ship's manifest, the furniture was destined for a Marco Castellon at a Corona, Queens, address. Customs and Drug Enforcement Administration ("DEA") officials removed the marijuana from the container, except for a small quantity deliberately left inside the false compartment. The furniture was placed back into the container, which was left on the Brooklyn waterfront to be claimed in the normal course by a customs broker. On March 29, Atlantic & Pacific Transport, Inc. ("A & P"), a brokerage firm, effected customs clearance for the container and transported it by truck to its lot in Queens. A & P personnel advised DEA agents that

someone would arrive on April 2, 1984, to transport the container.

On the morning of April 2, Kenneth Neal Chupurdy drove a tractor to the A & P lot; shortly thereafter, Marco Castellon arrived at the A & P offices. After Castellon completed payment, Chupurdy hooked up the container to his tractor and, followed by surveillance agents, drove to a truck stop in South Kearney, New Jersey. Castellon took a taxi from A & P to LaGuardia Airport and was arrested as he was about to board a flight to Florida. Agents stopped Chupurdy after he was observed driving away from the truck stop in his tractor without the container and then arrested him as a result of information Castellon provided to the DEA following his arrest. Thereafter DEA agents, pursuant to a search warrant, obtained a black bag belonging to Chupurdy from a New Jersey motel where he had been registered at the time of his arrest. Inside the bag was a telephone address book with various names and numbers, including the name "Ciannante [sic]" without any first name, telephone number, or address.

Castellon agreed to cooperate immediately following his arrest. He did so and eventually testified at trial. Castellon advised the DEA agents that the marijuana importation scheme had been conceived and directed by Jorge Serna and by a man named "Steven," whose last name Castellon did not know. Castellon described Steven as about thirty-five to forty years old, between five feet ten inches and six feet two inches tall, about 200 pounds, with dirtyish blond hair, a moustache, blue eyes, and "very nice teeth." He stated that Serna had recruited him to act as consignee for the container for $50,000, and provided details of the importation scheme.

During the previous few months Castellon had purchased some five kilograms of cocaine from Serna on a consignment basis for resale, for which he owed Serna about $20,000. On several occasions in late 1983 and early 1984, Castellon, when delivering sums of money to Serna for cocaine, observed Serna making notations in a black

notebook or ledger comprised of entries for various customers. Customers were designated by a code name or first name, and a detailed balance sheet for each customer recorded deliveries of kilograms of cocaine, payments made and balances due; a separate section listed accounts in Miami and Bahamian banks.

With respect to the marijuana container, Serna gave Castellon the bills of lading and other necessary documents and instructed him to travel to New York and hire a customs broker to handle the customs clearance. Castellon made three trips to New York in March 1984, retained the A & P brokerage firm, and paid for its services with money that Serna provided. A & P reported delays and during one of the trips Castellon telephoned Serna, who advised him that an "American gentleman by the name Steven" would call him at his hotel to ask about the delays. A few minutes later, Castellon received a telephone call from a man who identified himself as Steven and asked Castellon questions about the lack of progress in clearing the container.

On March 29, 1984, Serna and Castellon met in a Miami restaurant to discuss the delays. Serna remarked to Castellon that his "American friends will not believe him any more." He also confided that "this gentleman Steven ... has the customer for this marijuana" and remarked that they would now refer to Steven as "John." Later the same day, A & P cleared the container and told Castellon he had to collect it from the lot as soon as possible. After learning of this news, Serna told Castellon to go to a House of Pancakes restaurant in Miami the following morning to meet Steven and Steven's truckdriver. At the restaurant Serna introduced Cinnante to Castellon only as "Steven"; Chupurdy was identified simply as the truckdriver. Cinnante sat down next to Serna and across from Castellon and Chupurdy, about two to three feet from Castellon. Because of language difficulties Castellon, who spoke both English and Spanish, acted as interpreter. Castellon reported to "Steven" that A & P wanted the container moved from its lot "as soon as possible" because

of a recent snowstorm. Discussing transportation, Cinnante told Serna that, before delivering the marijuana to the customer in Philadelphia, he planned to leave the container overnight in a rest area in New Jersey to "see if the feds are watching." He explained that on a prior occasion the container was found to be "full of bugs," i.e., electronic devices. Serna told Cinnante that it was "good" to have snow covering the container because "that way the marijuana will not smell." Castellon, hesitant to use the word "marijuana" in a public place, incongruously used the word "pot" to convey this message in English. Cinnante remarked to Serna that "you will not believe how fast you're going to get your money." Serna replied that "money is the last thing [I'm] worried about." He stressed that he wanted Steven to be in Philadelphia when the deal was consummated to avoid dispute about the quantity and quality of the merchandise.

At this stage in the House of Pancakes conversation, Serna and Cinnante began to speak about other transactions. Serna asked, "[H]ow about a little money[?]" and Cinnante replied that he could probably get $50,000 or $75,000. Serna and Cinnante also discussed Serna's recent purchase of a DC–3 airplane, which was ready for a "test flight down there." Serna told Cinnante that he "must not forget that next week they have [another] container coming into San Francisco." The entire conversation lasted about thirty to thirty-five minutes.

After the meeting, Castellon asked Serna whether he was sure that "Steven" and the truckdriver were not "policemen." Serna assured Castellon that "Steven," who resided in the Boca Raton area, was a long-standing business associate in cocaine trafficking who owed Serna $800,000 for cocaine already delivered and was asking for more cocaine.

Castellon also cooperated after his arrest by telephoning Serna while DEA agents tape-recorded the conversation. In all, seven such telephone conversations in Spanish were recorded. Using a cover story provid-

ed by the DEA agents, Castellon told Serna that he was still in New York because he had missed his flight as a result of a weapons check by airport police. Castellon asked Serna whether he had spoken to "Steven." Serna responded, "No, I'm waiting for him to call me," and suggested that the airport stop "could be a coincidence." The following day Serna informed Castellon that he learned from "John" that the "chauffeur was in jail" and added that it was "strange" for Castellon not to have been arrested. Serna also instructed Castellon that if he was caught he should claim lack of knowledge about the marijuana and assert that a fictitious Pedro Gonzalez had hired him to act as consignee. Serna promised to provide a lawyer for Castellon's defense, admonished him to be loyal and discreet, and warned him that "everything is going to get complicated" if he revealed that Serna was the marijuana's owner.

Later that day, Serna informed Castellon that "John" was accusing Castellon of cooperating with the authorities, whereas Serna had told "John" that he was "leery of ... his chauffeur," who Serna suspected was involved in a scheme to "rip off" John. Serna added that he believed that the "chauffeur" had cooperated with the authorities because "that stuff [was] welded together very well." In relating his conversations with "John," Serna several times referred to John as Steven, at one point immediately correcting himself.

On April 4, 1984, DEA agents, armed with an arrest warrant for Serna, accompanied Castellon to Miami. Castellon telephoned Serna's beeper and in two recorded conversations advised Serna that he had returned to Miami and wished to meet with him to obtain more money. Serna demanded to know about Castellon's "balance with me for twenty," an apparent reference to the $20,000 Castellon owed for cocaine delivered. Although Serna told Castellon to call back to set up a meeting, Castellon's subsequent calls to Serna's beeper went unanswered.

On April 6, Nubia Serna, Serna's wife, left their residence in Key Biscayne and drove to the parking lot of a Burger King restaurant in Miami where she gave two men an attache case and a shopping bag. DEA agents who had her under surveillance stopped the men, who handed over the attache case, a black notebook, and the shopping bag, which contained men's clothing. Looking in the black notebook, one of the agents recognized it as a narcotics ledger reflecting large-scale cocaine transactions. Upon opening the attache case, the agents discovered numerous items of identification with Serna's name and photograph, a card containing the beeper number that Castellon had dialed to contact Serna for the agents, and a handwritten list containing names and telephone numbers identical to some of those found in the black ledger. The two men told the agents that all of these items "belonged to Mr. Serna." An analysis of the ledger revealed that it recorded deliveries of more than 200 kilograms of cocaine between April 1983 and March 1984 to twenty-one major customers for which the customers had already paid approximately $5 million, with several million dollars still outstanding. Serna was finally located and arrested on June 26, 1984. In his possession were several identification documents, all in a false name.

DEA Group Supervisor Raymond Tripicchio decided that the defendant Steven John Cinnante, who resided in the Boca Raton area, was likely the "Steven" Castellon had met. The agent obtained a copy of Cinnante's 1980 driver's license bearing his photograph, which showed Cinnante to have dark hair and no moustache. He reproduced that photo and showed it in a photograph array of seven other clean-shaven men to Castellon. Castellon said that Cinnante's photograph "look[s] very much like ... Steven," but declined to make a positive identification because the man pictured had no moustache, had darker hair, and appeared to be younger than "Steven." At Castellon's suggestion, he drew a moustache on a copy of Cinnante's photo, stating that it "looks like ... this Steven that I have met in the House of Pancakes," but he could not be "totally sure" without see-

ing a "better picture." Thereafter, Tripicchio obtained a copy of Cinnante's May 1984 driver's license, which had a photo of him with light brown hair and a full moustache. The agent then prepared a photographic array comprised of ten photos, including Cinnante's, of moustached men with some similar facial features. He also prepared a photo array that did not include Cinnante; it consisted of ten men without moustaches, one of whom was a subject of a DEA investigation and named Steven. Castellon recognized none of the photographs in the latter array. After looking for about ten minutes at the former photo array, he asked for the photo array from July, compared the two, and identified Cinnante's recent and earlier photos as "Steven." Cinnante was arrested on September 25, 1984.

On June 17, 1985, the date of jury selection, Castellon went to the courthouse cafeteria and joined the long line of people waiting to buy lunch. As the man ahead of him turned, Castellon was "shocked" to see that he was "Steven." Castellon had believed "Steven" was in jail. Castellon testified that "he looked at me very angry," and Castellon looked away from the "twin representation of Steven." That individual, however, repeatedly turned around, looked angrily at him and then spoke with intermittent nervous laughter to the woman who accompanied him. The man in line ahead of Castellon was Cinnante.

Neither defendant testified, the principal defense focusing on Castellon's credibility, and especially on his admitted cocaine involvement and his cooperation agreement.

## DISCUSSION

■ Although Cinnante does not challenge on appeal the denial of the motion to suppress Castellon's photo identification, his appeal rests in large part on the assertion that the identification was unreliable. We therefore address first Castellon's identification of Cinnante. We point out that we have examined the photo arrays and the various photographs in this case. These photo arrays are not overly suggestive and

the trial court's denial of the suppression motion was proper. Before he saw the photos, Castellon's physical description of Cinnante was an accurate one—about six feet tall, light colored hair, thick moustache, blue eyes, bright teeth. Castellon was within two to three feet of Cinnante for at least half an hour at the House of Pancakes. Remarkably, he was able to select Cinnante's 1980 photograph out of an array of eight clean-shaven people. The accuracy of Castellon's recollection is underscored by the fact that after drawing a moustache on a photocopy of that photo, he said that it looked like "Steven" but would not make a positive identification because the photo depicted a younger man than the one he had met. When he saw an up-to-date photo of Cinnante in a non-suggestive array of ten, he identified it as "Steven," although he first compared the two arrays containing Cinnante's photo. There is no evidence that the cafeteria encounter was prearranged; not surprisingly Castellon was shocked to find himself standing behind the man against whom he was to testify. Moreover, it is a fact that Cinnante's first two names are Steven and John. While the taped conversations between Serna and Castellon were admitted only against Serna, they substantiate Castellon's testimony that the man he met at the House of Pancakes was known as "Steven" and "John." Thus, the possibility that Castellon was framing Cinnante, as Cinnante suggests in connection with his motion for a new trial, is remote at best.

■ Cinnante claims that his motion for a new trial based on newly discovered evidence was improperly denied. The newly discovered evidence relates to "Benji," whom appellant's counsel alleges to be Benjamin Lee Weinstein, a Boca Raton resident who has a moustache somewhat similar to Cinnante's. The Government recovered a telephone message slip in Chupurdy's New Jersey motel room noting that a "Benji" with the phone number 766-4177 had called him, apparently from San Francisco, on the morning of April 2, while Chupurdy was picking up the container.

Chupurdy's address book, also confiscated by the DEA, contains the name Ben B. and the same number, which indeed is the beeper number of Mr. Weinstein.

All of these things are very interesting and there is a considerable resemblance between Weinstein and Cinnante, at least as the two men appear in their driver's license photographs, and as Weinstein appears in a photograph taken at a party with cocktail glass in hand. Unlike Cinnante, however, Weinstein does not match Castellon's original description of "Steven" as about six feet tall with dirtyish blond hair; Weinstein appears to have darker hair and is about five feet eight inches.

Cinnante argues that if he had known of the message slip and had been able to locate "Benji" before trial he might well have created reasonable doubt in the mind of at least one juror. He claims that the Government's failure to turn over the message slip violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). But *Brady* applies only to evidence favorable to the accused. *Id.* at 87, 83 S.Ct. at 1196–97. Prior to Cinnante's new trial motion, the Government, which had been unable to discover Benji's identity, simply had no basis to believe the slip had any relevance to this case. Moreover, in light of Castellon's certain identification of Cinnante, the appellant has failed to show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, — U.S. ——, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985). Having failed to meet *Bagley's* "reasonable probability" standard, Cinnante also fails to meet the higher standard for a new trial based on newly discovered evidence—that the new evidence "would probably lead to an acquittal." *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir. 1981), *cert. denied*, 456 U.S. 946, 102 S.Ct.

2014, 72 L.Ed.2d 469 (1982); *see also United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980).

We also reject appellants' claim that certain hearsay evidence was improperly excluded. Cinnante argues that he should have been permitted to offer into evidence Serna's comment to a DEA agent that Cinnante was the "wrong man." After a pretrial hearing Judge Platt found that this comment was inadmissible under Fed.R.Crim.P. 11(e)(6)(D) because it was made in the course of plea negotiations.[1] Whether a party is engaged in plea discussions is a factual question that must be determined on a case-by-case basis. *See United States v. Grant*, 622 F.2d 308, 312 (8th Cir.1980). We have little difficulty in concluding that Serna had entered into plea discussions with the Government at the time he made the statement. Prior to trial, Serna and his retained counsel met with an Assistant United States Attorney and two DEA agents to discuss the possibility of Serna's cooperation with the Government. General guidelines were discussed at this meeting, but Serna was not questioned on his role as a drug dealer. The AUSA indicated that statements made by Serna would not be used against him and Serna was informed that his cooperation would be made known to the sentencing judge, but that the cooperation had to be total. To determine Serna's sincerity in cooperating, a DEA agent interviewed him in the presence of his counsel. No Government attorney was present. Serna was less than forthcoming, although he did admit his involvement in importing the container. When asked about Cinnante's involvement, according to the agent, Serna shook his head and "may have said, you have the wrong person or indicated that no, no, you're talking about the wrong man." At this point the agent decided that Serna's

---

1. Fed.R.Crim.P. 11(e)(6)(D) provides:
   Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

   . . . . .

   (D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

professed cooperation was a sham and terminated the interview, and no further plea discussions were held. In light of the initial meeting with the AUSA, this preliminary discussion must be considered as part of the overall plea bargaining process. A requirement that such negotiations be more formal would contravene Rule 11(e)(6) by discouraging plea bargaining. *See United States v. Levy*, 578 F.2d 896, 901 (2d Cir.1978); *see also Santobello v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). Although the rule prohibits use of statements only "against the defendant who ... was a participant in the plea discussion," and the statement was sought to be admitted only in favor of a codefendant, if Cinnante had been allowed to introduce the statement into evidence there is a strong likelihood that the jury would have considered it as evidence against Serna. A limiting instruction would have been ineffective to protect Serna from the devastating impact of the statement that was tantamount to a confession. *Cf. Bruton v. United States*, 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968). Of course, had Cinnante been tried separately from his codefendant, Rule 11 would not have prevented introduction of Serna's statement.

■ A somewhat more difficult question is raised by the absence of a Government attorney when the excluded statement was made, since Rule 11(e)(6)(D) requires that the statement be made "in the course of plea discussions with *an attorney* for the government" (emphasis added). The Notes of the Advisory Committee on Rules to the 1979 amendments indicate that the requirement of an attorney's presence was added to prevent the exclusion of statements made to Government agents when there has been no participation of a Government attorney. *See, e.g., United States v. Herman*, 544 F.2d 791 (5th Cir.1977). We think the rule can be fairly read to require the *participation* of a Government attorney in the plea discussions, but not necessarily his physical *presence* when a particular statement is made to agents whom the attorney has authorized to engage in plea

discussions. *See Grant*, 622 F.2d at 313. Because the agents were acting under the AUSA's authority in determining whether Serna would in fact cooperate, Serna's statement was properly excluded. We thus have no need to reach the Government's alternative contention that the statement was inadmissible under Fed.R.Evid. 804(b)(3).

■ Cinnante and Serna also argue that the trial judge erred in excluding hearsay evidence from the transcript of Chupurdy's testimony at his trial. Chupurdy had testified that he did not attend any meeting at the House of Pancakes and that he did not know either Serna or "Steven." The same Assistant United States Attorney prosecuted both Chupurdy and Serna and Cinnante, and Castellon testified in both trials about the House of Pancakes meeting. Appellants contend that Chupurdy's testimony fits within the hearsay exception of Fed.R.Evid. 804(b)(1). However, the rule requires that the declarant be unavailable as a witness and the Government have had an opportunity and similar motive to cross-examine the witness at the previous trial. Cinnante's counsel served Chupurdy with a trial subpoena, and Chupurdy indicated through his attorney that he would invoke the Fifth Amendment. Judge Platt apparently accepted the representation that Chupurdy was unavailable, although he held no hearing on this question. Because Castellon's credibility was a key issue in Chupurdy's case, the prosecutor arguably had a motive to cross-examine Chupurdy on his claim that he had not attended a House of Pancakes meeting. However, since cross-examination was unlikely to shake Chupurdy's denial of such a meeting, the prosecutor, wisely, we think, chose to focus his cross-examination on the details of Chupurdy's transportation of the container to show that his claim of ignorance of its contents was unbelievable, rather than to emphasize to the jury Chupurdy's denial of any House of Pancakes meeting. Thus, exclusion of Chupurdy's statements was not an abuse of the trial court's discretion

since the prosecutor had no real motive to explore Chupurdy's earlier statements.

■ Judge Platt, however, did not categorically exclude the statements under Rule 804(b)(1). Instead, he offered to admit them conditioned on informing the jury that Chupurdy's "jury didn't believe him and found him guilty and he's doing five years in jail." Defense counsel rejected this offer. Under Fed.R.Evid. 806 the credibility of such hearsay "may be attacked ... by any evidence which would be admissible for those purposes if [the] declarant had testified as a witness." Since the conviction cast doubt on the credibility of Chupurdy's statements, conditioning admission of that hearsay evidence on informing the jury of the conviction was not an abuse of discretion. *See, e.g., United States v. Noble,* 754 F.2d 1324, 1331 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985).

■ Cinnante and Serna also claim that the trial court improperly excluded expert witness testimony proffered on Castellon's identification of Cinnante. We have carefully examined the expert's voir dire and find that the ruling was not clearly erroneous. *See United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985). A trial judge is accorded broad discretion in admitting or excluding expert testimony under Fed.R.Evid. 702 and in excluding testimony under Fed. R. Evid. 403 because of the danger of jury confusion or unfair prejudice. *See id.* at 400, 401 & n. 6 (citing *United States v. Young,* 745 F.2d 733, 765–66 (2d Cir.1984) (Newman, J., concurring), *cert. denied,* —— U.S. ——, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985)). The expert here was ignorant of the conditions under which Castellon identified Cinnante's photograph and his proposed testimony basically consisted of general pronouncements about the lack of reliability of eyewitness identification, particularly cross-racial identification. He also acknowledged that many of his conclusions coincided with common sense. This court is fully aware of the dangers of testimony based purely on eyewitness identification, and we have often

commented on those dangers. *See, e.g., Kampshoff v. Smith,* 698 F.2d 581, 585–86 (2d Cir.1983). Nevertheless, we do not think that this expert's proffered testimony would have done anything other than to muddy the waters.

■ Given that Castellon's photo identification of Cinnante was properly admitted, Cinnante's sufficiency argument is without merit. The evidence shows that Cinnante was a broker for the sale of the two and one-half ton marijuana shipment, hired the truckdriver, directed the transportation, and set up the contemplated sale of the shipment; he was also a major cocaine customer of Serna's and owed the latter $800,000 for cocaine delivered. This evidence is more than sufficient to uphold his conviction on the possession and conspiracy charges, given the appellant's very heavy burden on a sufficiency of the evidence claim.

■ Finally, Serna claims that the trial court improperly admitted the drug ledger in evidence against him. Although Jairo Perez, who handed over the drug ledger and who was carrying the briefcase filled with Serna's papers, did not testify at trial, Tripicchio testified that Perez told the agents that the ledger was Serna's and Castellon testified that he recognized it as Serna's because on several occasions he had seen it in Serna's possession when delivering money to Serna for previous cocaine deliveries. Indeed, Castellon identified a section in the ledger referring to "Marco" as the account of his own cocaine purchases. Under Fed.R.Evid. 901(a) the Government "need only prove a rational basis from which the jury may conclude that the exhibit did, in fact, belong to the appellant[ ]." *United States v. Natale,* 526 F.2d 1160, 1173 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). Here, the testimony of Tripicchio and Castellon made out a prima facie case connecting the exhibit to the defendant; the evidence was thus properly submitted to the jury for a determination on its authenticity. *See United States v. Goichman,* 547 F.2d 778, 784 (3d Cir.1976). We

think the ledger was duly authenticated and properly admitted.

Judgment affirmed.