**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 16, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TYLER JAY MULLINS,

    Defendant - Appellant.

No. 24-7003

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:21-CR-00060-CBG-1)**

_____

Katayoun A. Donnelly, Azizpour Donnelly LLC, Denver, Colorado, for
Defendant-Appellant.

Patrick M. Flanigan, Assistant United States Attorney (Christopher J. Wilson,
United States Attorney, with him on the brief), Muskogee, Oklahoma, for
Plaintiff-Appellee.

_____

Before **PHILLIPS**, **KELLY**, and **MORITZ**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

    In 2002, Tyler Jay Mullins pleaded guilty in Oklahoma state court to

murdering his ex-girlfriend. But after the Supreme Court's decision in _McGirt_

_v. Oklahoma_, 591 U.S. 894 (2020), the state court vacated his conviction for

lack of jurisdiction. Soon after, a federal grand jury charged Mullins with murder in Indian country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153; using, carrying, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i)–(iii); and causing the death and murder of another while violating 18 U.S.C. § 924(c), in violation of 18 U.S.C. § 924(j)(1). The district court dismissed the § 924(c) count as time-barred. A jury convicted Mullins on the other two counts.

Mullins now appeals. He argues that the district court erred in three ways: (1) by denying his motions to stay proceedings or dismiss the indictment for substantial failure to comply with the Jury Selection and Service Act, 28 U.S.C. §§ 1861–78; (2) by denying his motion to suppress his statements directing law enforcement to the location of his ex-girlfriend's body; and (3) by denying his motion to compel disclosure of communications between the government and his former counsel.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. First, because Mullins never satisfied the Jury Act's procedural requirements, the district court did not err in denying his Jury Act motions. Second, because Mullins did not direct officers to his ex-girlfriend's body during plea discussions with the prosecuting authority, the court did not err in denying his motion to suppress. And third, even if the court erred in denying Mullins's motion to compel, that error was harmless.

2

## BACKGROUND

### I.    Factual Background

Early one morning in 2002, Rachel Woodall disappeared from her home in Ada, Oklahoma. Woodall's ex-boyfriend Tyler Mullins quickly became a suspect.

A neighbor had seen him rifling through Woodall's car the morning she disappeared. And later that morning, Mullins had called Woodall's mother and boyfriend. Mullins acted oddly on the calls and asked about Woodall's whereabouts.

When officers located Mullins soon after, he had several superficial injuries. Though he claimed some guys beat him up, his injuries seemed inconsistent with that claim. For example, he had several "fingernail-like scratches" and bruising on his right hand.

Later that day, officers searched Mullins's car and house. They found blood in his car trunk. They also found bloodstained shoes in his house.

The next day, after speaking with his attorney, Mullins led law enforcement to Woodall's body. She was buried in a shallow grave and wrapped in a blue tarp. She also had several injuries, including three gunshot wounds to the head.

## II.     Procedural History

### A.     State Proceedings

Oklahoma charged Mullins with first-degree murder. He pleaded guilty about eight months later, and the state court sentenced him to life without parole.

About seventeen years after that, the Supreme Court decided *McGirt*. There, the Court held that some portions of eastern Oklahoma were Indian country. 591 U.S. at 897–98. And under the Major Crimes Act, only the federal government can prosecute certain crimes committed by Indians in Indian country. *Id.* at 932; *see also* 18 U.S.C. § 1153.

Because Mullins was an enrolled member of a federally recognized Indian tribe and the crime occurred within the Chickasaw Nation Reservation,[1] Oklahoma had lacked jurisdiction to prosecute him. As a result, a state-court judge granted Mullins's request for post-conviction relief.

### B.     Federal Proceedings

In 2021, a federal grand jury indicted Mullins for (1) murder in Indian country, in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153; and (2) causing the death and murder of a person while violating 18 U.S.C. § 924(c), in

---

[1] In *Bosse v. Oklahoma*, the Oklahoma Court of Criminal Appeals held that "the Chickasaw Reservation was never disestablished by Congress, and the lands within its historic boundaries are Indian Country." 499 P.3d 771, 774 (Okla. Crim. App. 2021) (citing 18 U.S.C. § 1151).

violation of 18 U.S.C. § 924(j)(1).[2] A jury ultimately convicted Mullins on both counts.

Three district-court rulings take center stage. We detail them below.

### 1. Motion to Suppress under Federal Rule of Evidence 410(a)(4)

Before trial, Mullins moved to suppress his statements directing law-enforcement officers to Woodall's body, as well as all derivative evidence. Mullins argued that he made these statements during plea negotiations, making them inadmissible under Federal Rule of Evidence 410. That rule prevents the government from using against a defendant any "statement made during plea discussions with an attorney for the prosecuting authority if the discussions . . . resulted in a later-withdrawn guilty plea." Fed. R. Evid. 410(a)(4).

The government opposed, arguing that the prosecutor never engaged in plea discussions with Mullins or his counsel. It also emphasized that Mullins gave law-enforcement officers, not the prosecutor, directions to Woodall's body.

### a. Hearing

The district court held a hearing on the motion. Three witnesses testified: former county Assistant District Attorney Chris Ross, Mullins's

---

[2] The grand jury also charged Mullins for using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i)–(iii). The district court later dismissed that count as time-barred.

former counsel Frank Stout, and Mullins. Below, we summarize the district court's factual findings from their testimony.

The day Woodall disappeared, Mullins agreed to speak with officers at the police station. *United States v. Mullins*, No. CR-21-60, 2022 WL 2306819, at *1 (E.D. Okla. June 27, 2022). Soon after, Mullins's uncle, Harry Jordan, retained Stout to represent Mullins. *Id.* Sometime that day, Stout spoke with Ross about Woodall's body. *Id.* at *2. According to Stout, Ross said that—if Mullins revealed Woodall's location—Ross would not seek the death penalty.[3] *Id.* In contrast, Ross testified that Stout approached *him* about the body's location and that he told Stout he had no interest in making a deal. *Id.*

Ross also testified that Jordan called him the next day to discuss Mullins. *Id.* Jordan asked what would happen to Mullins; Ross responded that he could not say, but that "the worst he could do was ask for the death penalty." *Id.* (citation modified).

Later that day, Stout told police that Mullins would take them to Woodall's body. *Id.* Officers from various agencies formed a "caravan" of cars and drove to the body's location. *Id.* Stout, Mullins, and some law-enforcement officers rode together in a bus, while Ross drove in his own car at the end of the caravan. *Id.* Based on Mullins's directions, law-enforcement officers found

---

[3] Mullins also testified that he believed he would get "a lighter sentence" by disclosing Woodall's location. *Mullins*, 2022 WL 2306819, at *2.

Woodall's body buried and wrapped in a tarp. *Id.* The next day, the state charged Mullins with Woodall's murder. *Id.*

Stout stopped representing Mullins about a month later. *Id.* About seven months after that, Mullins entered a blind guilty plea, and the state court sentenced him to life imprisonment. *Id.*

### b.     Ruling

After hearing the witnesses' testimony, the district court denied Mullins's suppression motion. *Id.* at *7. The court assumed Stout's version of events was true. *Id.* at *2. But it determined that, because Mullins directed law-enforcement officers—not the prosecutor—to Woodall's body, Rule 410(a)(4) did not apply. *Id.* at *4.

That said, the district court acknowledged two "exceptions" to its interpretation of Rule 410(a)(4). *Id.* at *5. It noted that some courts have applied the rule to conversations with police when the defendant had a reasonable subjective belief that he was speaking during plea negotiations. *Id.* And other courts have applied it when officers had express authority to negotiate a plea. *See id.* Even so, the district court ruled that neither exception applied because Mullins "ha[d] not presented facts to support the application of either of these exceptions." *Id.*

The court also rejected Mullins's request that it suppress all evidence derived from his statements. *Id.* Noting that Mullins had "no authority to support a finding that Rule 410(a)(4) is so far reaching," the court concluded

that the rule's plain language applied only to statements made during plea discussions. *See id.* Thus, the court reasoned that even if Rule 410(a)(4) applied to Mullins's statements about the body, it would not exclude any derivative evidence. *Id.* at *6.

### 2. Motion to Compel under Federal Rule of Criminal Procedure 16(a)(1)(E)

Mullins also moved to compel production of communications between the government and Robert Gifford, his former counsel in his federal case. Gifford was defense co-counsel for about seven months. After Gifford withdrew from the case, Mullins grew concerned that Gifford had disclosed attorney-client privileged information and failed to act in his best interest. So Mullins asked the government to provide its communications with Gifford. When the government failed to respond, Mullins moved the court to compel disclosure, suggesting the communications would support an ineffective-assistance claim.

The government opposed the motion, asserting that none of the communications included attorney-client privileged information. It also argued that the documents were not material to the defense, nor something the government planned to use at trial. Plus, the government noted that it did not obtain the records from Mullins and that he could "mak[e] a written demand of Mr. Gifford" for the documents. R. vol. I at 422.

8

### a.     Hearing

The court held a hearing to discuss outstanding motions before trial. It briefly addressed Mullins's motion to compel:

> [I]t appears . . . that these communications would not fall in something that would be discoverable under Rule 16 of the Federal Rules of Criminal Procedure. That said, I suppose that there is some small possibility that material or facts were disclosed by Mr. Gifford in the course of communications with counsel for the government in a way that would cause the Court to need to address some issue about effective assistance of counsel.

R. vol. III at 41. So the court reviewed the documents in camera.

### b.     Ruling

After reviewing the communications, the court denied Mullins's motion. It concluded that the documents were not discoverable under Rule 16(a)(1)(E), nor did they reflect any inappropriate disclosures by Gifford. The court emphasized, though, that it did "not address the ability of [Mullins] to obtain any such document, from the Government or from Mr. Gifford directly, for another purpose or in another proceeding." R. vol. I at 426.

### 3.     Jury Act Motions under 28 U.S.C. § 1867

### a.     Pretrial Motion

Before voir dire, Mullins orally moved to dismiss the indictment and stay proceedings under the Jury Act. He argued that the jury pool was neither randomly selected nor a fair cross-section of the community. For example, he noted that seven people from the jury pool came from Ada, Oklahoma, which he claimed was statistically unlikely. He suggested that this could "affect[]

9

[him] in a racially discriminatory manner" because some counties with more diverse populations were underrepresented. *See* R. vol. III at 58.

The district court denied the motion. It reasoned that "[t]he group of potential jurors here was selected through an established process for the Eastern District of Oklahoma based on a cross section of persons in that district eligible to serve on juries." *Id.* at 59. The court determined that "[t]he mere fact that the process may have resulted in a higher-than-average number of potential jurors from a certain area does not mean that a particular area was purposely favored or disfavored." *Id.* The court also noted that "[r]andom selection can result in clusters, and that may have been the case here." *Id.*

The parties then selected a jury and went to trial.

### b.    Trial Motions

Mullins raised his Jury Act motion twice more during trial. The court denied them for the same reasons as before.

### c.    Post-trial Motion

Mullins renewed his Jury Act motion again three days after the verdict. This time, he attached a sworn statement from his counsel supporting his claims. Mullins noted that under 28 U.S.C. § 1867(d), if a sworn statement of facts, taken as true, "would constitute a substantial failure to comply with" the Jury Act, then the movant is "entitled to present" supporting evidence. R. vol. I

10

at 609 (citation modified). Mullins argued that his renewed motion satisfied this standard and merited a hearing.

First, he claimed that the odds of seven jurors coming from Ada was "so remote that it had to be intentionally done." *Id.* at 611. In support, his motion contained statistics about the number of jurors from each county in the jury pool and those counties' demographics. Second, he argued that the jury pool had a disproportionate number of women and—based on his and his family's observations—lacked Native American and African American jurors.

The government opposed the motion as untimely and meritless. The district court agreed. On timeliness, it explained that defendants must bring Jury Act motions either before voir dire "or within seven days after the defendant discovered . . . the grounds" for the motion, "*whichever is earlier.*" *United States v. Mullins*, No. CR-21-60, 2023 WL 6323079, at *2 (E.D. Okla. Sept. 28, 2023) (citation modified). Because Mullins renewed his motion three days after trial, the court found it "untimely and procedurally barred." *Id.*

As for the merits, the court held that Mullins failed to show "a deviation" from the Eastern District's established jury plan. *Id.* at *3. What's more, Mullins made only "visual observations" to support his claim that the jury pool was not a fair cross-section of the community. *Id.* at *4. The court found this insufficient to establish "systematic exclusion of Native Americans or African Americans" in the jury-selection process. *Id.*

### 4.    Jury Trial

To briefly recap Mullins's trial, nine witnesses testified for the government. One witness testified that, the night before the murder, Mullins kept asking whether Woodall's roommate would be home that night. Woodall's neighbor testified that he saw Mullins outside Woodall's house the morning of the murder and watched him rifle through her car. Next, both Woodall's boyfriend and her mother testified about strange phone calls they received from Mullins that morning asking about Woodall's whereabouts.

The government also called Stout, who explained that Mullins led law-enforcement officers to Woodall's body. The next several witnesses testified about evidence recovered from Mullins's house, his car, and the crime scene. And an FBI agent testified that about a year after the murder, Mullins "volunteered that he had killed Rachel Woodall" during an unrelated interview. R. vol. III at 347–48.

On the defense side, both Mullins and his mother testified.[4] Mullins admitted to killing Woodall but suggested he did so in self-defense. In brief, he testified that he went to Woodall's house the morning of the murder to talk to her, but she didn't answer the door. So he went into her car to leave her a note. There, he found her journal, read it, and left with it.

---

[4] Mullins's mother testified about his decision to plead guilty in state court.

Woodall called him soon after, so he went back to her house and picked her up. While they were driving, they started fighting about things she wrote in her journal. The fight turned physical, and she hit or scratched him. So he pulled off the highway onto a side road.

Mullins stopped the car, got out, and grabbed the journal from his trunk. When Woodall saw he had her journal, she got angry and tried to hit him. Mullins walked back to the driver's seat and asked her to get in the car. Then he saw her approaching him with his gun, which he kept in his trunk, pointed at him.

Scared, Mullins tried to get away. He found a tire rim on the ground and held it between him and the gun. He heard something click and "just snapped," swinging the tire rim at Woodall. He could not remember how many times he hit her—he swung the rim until it flew out of his hand.

Woodall, lying on the ground, was not moving. Thinking she was dead, Mullins wrapped her in a tarp, put her in the trunk, and drove to a gravel pit. After placing Woodall in a shallow grave, he considered shooting himself; but instead, he pointed the gun at the ground and started shooting, hitting Woodall multiple times in the head. He then covered the tarp with dirt and drove away.

### 5.  Verdict, Sentencing & Appeal

The jury found Mullins guilty on both counts. The district court sentenced him to two concurrent life sentences. He timely appealed.

Mullins argues that the court reversibly erred by (1) denying his Jury Act motions, (2) denying his motion to suppress his statements directing officers to Woodall's body, and (3) denying his motion to compel disclosure of Gifford's communications with the government. We disagree and affirm.

## DISCUSSION

### I. Jury Act Motions

First, Mullins challenges the district court's denials of his motions for relief under the Jury Act.

#### A. Standard of Review

We review de novo a district court's legal conclusions "involving a jury-composition claim." *United States v. Kamahele*, 748 F.3d 984, 1022 (10th Cir. 2014). We review the court's factual findings for clear error. *Id.* "A finding of fact is clearly erroneous only if it is without factual support in the record" or if, after reviewing the evidence, we are "left with a definite and firm conviction that a mistake has been made." *United States v. Craine*, 995 F.3d 1139, 1157 (10th Cir. 2021) (citation omitted).

#### B. Analysis

The Jury Act gives federal defendants entitled to a jury trial "the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. Every federal district court must implement "a written plan for random

selection" of jurors that is "designed to achieve" the Act's objectives. *Id.* § 1863(a).

Section 1867 provides "the exclusive means by which a person accused of a Federal crime[] . . . may challenge any jury on the ground that such jury was not selected in conformity with" the Act. *Id.* § 1867(e). And § 1867(a) states that

> before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

Such motions must "contain[] a sworn statement of facts." *Id.* § 1867(d); *United States v. Stein*, 985 F.3d 1254, 1262 (10th Cir. 2021). And when the sworn statement of facts, "if true, would constitute a substantial failure to comply" with the Act, the movant "shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence." *Id.* § 1867(d).

If the court finds a substantial failure to comply with the Act in selecting the grand jury, it shall either "stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment." *Id.* On the other hand, if there's a substantial failure to comply "in selecting the *petit* jury,

the court shall stay the proceedings pending the selection of a petit jury in conformity with this title." *Id.* (emphasis added).

"Strict compliance with [the Jury Act's] procedural requirements is essential." *Stein*, 985 F.3d at 1262 (citation omitted). This is because the Act's procedural requirements were "designed to give the district court an opportunity to evaluate the alleged noncompliance and to correct such noncompliance before precious judicial resources are invested in a trial." *United States v. Contreras*, 108 F.3d 1255, 1266 (10th Cir. 1997).

Mullins moved four times to stay proceedings or dismiss the indictment for noncompliance with the Jury Act.[5] The district court denied all four motions. That wasn't error, because each motion failed to satisfy the Act's procedural requirements.

Start with Mullins's motion on the first day of trial. He moved to stay proceedings "before the voir dire examination" began, so this motion was timely. *See* 28 U.S.C. § 1867(a). Yet it lacked a sworn statement of facts.

We have held that if a defendant fails "to accompany [his] motion[] challenging the jury selection process with a sworn affidavit," then his Jury Act claim "is precluded." *Contreras*, 108 F.3d at 1267–68; *see also United States v. Cooper*, 733 F.3d 1360, 1366 (10th Cir. 1984). Thus, because Mullins's motion

---

[5] We note that because Mullins's Jury Act motions centered on the petit jury, dismissal was not an available remedy. *See* 28 U.S.C. § 1867(d).

16

lacked a sworn statement of facts, his first Jury Act motion was procedurally barred.[6] *See Contreras*, 108 F.3d at 1267–68.

Next, consider the two motions Mullins raised during trial. Neither contained a sworn statement of facts. Like the first motion, this failure "precluded" Mullins's Jury Act claim. *See id.*

What's more, the motions were untimely, too. Under 28 U.S.C. § 1867(a), a defendant must move to stay proceedings "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered[] . . . the grounds therefor, whichever is earlier." Because Mullins raised these motions after voir dire, they were untimely. *See United States v. Phillips*, 239 F.3d 829, 840–41 (7th Cir. 2001) (concluding that Jury Act motion "made orally approximately three-quarters of the way into voir dire" was untimely).

Finally, turn to Mullins's renewed Jury Act motion, raised three days after trial ended. This time, he included a sworn statement of facts. So his final motion complied with § 1867(d)'s procedural requirements. But like the last two motions, his final motion was untimely because he filed it after voir dire.

---

[6] The district court denied Mullins's first motion on the merits. But we can affirm "on any ground supported by the record." *United States v. Spradley*, 146 F.4th 949, 958 (10th Cir. 2025); *see also Stein*, 985 F.3d at 1263 (holding that we may "affirm[] the district court's judgment on [procedural] ground[s], even though the court did not address any procedural deficiencies of the [Jury Act] motion").

17

*See id.* As a result, his final motion did not comply with § 1867(a)'s procedural requirements.

Mullins emphasizes that he filed the final motion less than seven days after he discovered the alleged noncompliance. But his motion was still untimely under § 1867(a). Again, defendants must move for Jury Act relief "before the voir dire examination" or "within seven days after [they] discovered or could have discovered[] . . . the grounds therefor, *whichever is earlier*." *See* 28 U.S.C. § 1867(a) (emphasis added).

Put differently, Mullins had to file his motion "no later than before the voir dire examination begins." *United States v. DeFries*, 129 F.3d 1293, 1299 (D.C. Cir. 1997) (citation modified); *see also United States v. Rosbottom*, 763 F.3d 408, 416 (5th Cir. 2014) ("It is obvious that the commencement of voir dire is the cut-off point for challenges under the Act, both under its express terms and because the only remedy it provides is a stay in the proceedings until a jury can be selected in conformity with the statute." (citation modified)).[7] So by raising his renewed Jury Act motion after voir dire, Mullins failed to comply with the Act's procedural requirements. *See Phillips*, 239 F.3d at 840.

---

[7] We note that both *DeFries* and *Rosbottom* suggest that there may be an exception to the Jury Act's procedural requirements when "counsel could not reasonably have been expected to comply with the procedural prerequisites to a statutory challenge to the jury." *DeFries*, 129 F.3d at 188 (citation omitted); *see also Rosbottom*, 763 F.3d at 415. Because Mullins never argues that such an exception applies, we need not consider it here.

Lastly, Mullins argues that the district court should have stayed the case and held a hearing so that he could inspect records about the jury pool's composition under 28 U.S.C. § 1867(f). True enough, § 1867(f) gives parties the right to inspect such records to prepare a § 1867(a) motion. And in *Test v. United States*, the Supreme Court held that § 1867(f) gives litigants "essentially an unqualified right to inspect jury lists." 420 U.S. 28, 30 (1975) (per curiam); *see also United States v. Lawson*, 670 F.2d 923, 926 (10th Cir. 1982) (similar).

But importantly, the *Test* and *Lawson* defendants "request[ed] permission to inspect and copy the jury lists pertaining to" their jury venires. *Test*, 420 U.S. at 29 (citation modified); *Lawson*, 670 F.2d at 926. Mullins, though, never moved to inspect or copy records under § 1867(f). Instead, he requested relief under § 1867(d). And again, he failed to comply with that section's procedural requirements.

In sum, all four Jury Act motions were procedurally deficient.[8] So the district court did not err in denying them.

## II.   Rule 410 Motion

Next, Mullins argues that the district court erred by denying his motion to suppress his statements directing law-enforcement officers to Woodall's body.

---

[8] For that reason, we need not consider whether the motions also failed on the merits.

## A.    Standard of Review

We review de novo "legal interpretations of the Federal Rules of Evidence." *United States v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018). But we review evidentiary rulings for abuse of discretion. *United States v. Channon*, 881 F.3d 806, 809 (10th Cir. 2018). So we reverse an evidentiary ruling only if it rests "on a clearly erroneous finding of fact or an erroneous conclusion of law," or if it "manifests a clear error in judgment." *Id.* at 809–10 (citation omitted).

Mullins's claim involves the district court's interpretation of Federal Rule of Evidence 410(a)(4). We review the court's interpretation of the rule de novo and its factual findings for clear error. *See Silva*, 889 F.3d at 709; *Channon*, 881 F.3d at 809–10.

## B.    Analysis

Under Rule 410, "a statement made during plea discussions with an attorney for the prosecuting authority" is inadmissible against a criminal defendant "if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea." Fed. R. Evid. 410(a)(4). This rule "grew out of longstanding case law excluding th[e] type of especially damning evidence" surrounding guilty pleas. *United States v. Mitchell*, 633 F.3d 997, 1003 (10th Cir. 2011).

Another federal rule informs our understanding of Rule 410(a)(4): former Federal Rule of Criminal Procedure 11(e)(6)(D). Rule 11(e)(6)(D) prohibited

"admission of any statement made in the course of plea discussions with an attorney for the government which d[id] not result in a plea of guilty." *United States v. Browning*, 252 F.3d 1153, 1158 (10th Cir. 2001) (citation modified). Though Rule 410(a)(4) uses slightly different language, we often treated the two rules interchangeably. *See, e.g.*, *United States v. Ruminer*, 786 F.2d 381, 385 (10th Cir. 1986) ("Rule 11(e)(6) is essentially identical to Rule 410."); *United States v. Acosta-Ballardo*, 8 F.3d 1532, 1534–35 (10th Cir. 1993) (similar); *United States v. Medina-Estrada*, 81 F.3d 981, 985 n.3 (10th Cir. 1996) (similar). Because of the rules' similarities, we consider caselaw discussing Rule 11(e)(6)(D) persuasive when interpreting Rule 410(a)(4).

Mullins argues that his statements directing officers to Woodall's body were part of "plea discussions with an attorney for the prosecuting authority," making them inadmissible under Rule 410(a)(4). The district court held that because Mullins spoke to law-enforcement officers instead of a prosecutor, Rule 410(a)(4) did not protect his statements.[9] *Mullins*, 2022 WL 2306819, at *4.

We, too, think that Mullins's statements fall outside Rule 410(a)(4)'s scope. Rule 410 protects statements made "during plea discussions *with an attorney for the prosecuting authority*." Fed. R. Evid. 410(a)(4) (emphasis

---

[9] Rule 410(a)(4) also requires there be "a later-withdrawn guilty plea." Neither party disputes that we should treat Mullins's state-court guilty plea as withdrawn.

21

added). Relying on its plain language, some circuits have held that Rule 410(a)(4) applies only to statements made to prosecuting attorneys. *See, e.g.*, *United States v. Bauzó-Santiago*, 867 F.3d 13, 19–20 (1st Cir. 2017); *United States v. Bernal*, 719 F.2d 1475, 1478 (9th Cir. 1983), *abrogated on other grounds by, Crawford v. Washington*, 541 U.S. 36, 68–69 (2004). Other circuits have read Rule 410(a)(4) more broadly to cover conversations with government agents expressly or impliedly authorized to negotiate a plea. *See, e.g.*, *United States v. McCauley*, 715 F.3d 1119, 1125–26 (8th Cir. 2013); *cf. United States v. Serna*, 799 F.2d 842, 848–49 (2d Cir. 1986) (interpreting Rule 11(e)(6)(D)), *abrogated on other grounds by*, *United States v. DiNapoli*, 8 F.3d 909, 914 n.5 (2d Cir. 1993) (en banc).

When we considered Rule 11(e)(6)(D)'s scope in *Browning*, we favored a strict reading. There, we considered whether Rule 11(e)(6)(D) covered a defendant's statements to DEA agents. 252 F.3d at 1158. Relying on the rule's plain language, we suggested that it protected only statements made when "speaking with an attorney for the government." *Id.* (citation modified). Because the defendant spoke to DEA agents, not a government attorney, we held that his statements did not "fall within the [rule's] plain language." *Id.*

That said, we also acknowledged the Eighth Circuit's ruling in *United States v. Lawrence*, 952 F.2d 1034 (8th Cir. 1992). *See Browning*, 252 F.3d at 1158. *Lawrence* held that Rule 11(e)(6)(D) also applied to "situations where law-enforcement officials enter into negotiations with *express* authority from a

government attorney." 952 F.2d at 1037. Without adopting *Lawrence*'s reading of Rule 11(e)(6)(D), we dismissed the defendant's related arguments because he provided no evidence that the agents had express authority to negotiate a plea. *Browning*, 252 F.3d at 1158.

Here, as in *Browning*, Mullins's motion fails under either interpretation of Rule 410(a)(4).

First, Mullins's motion fails under a strict reading because Mullins directed law-enforcement officers—not Ross or another prosecutor—to the body. *See id.*; *see also Bauzó-Santiago*, 867 F.3d at 19–20.

Second, Mullins's motion fails under a broad reading, too, because no evidence supports that the officers Stout spoke to or the ones Mullins directed to the body were authorized to negotiate a plea. *See Browning*, 252 F.3d at 1158; *McCauley*, 715 F.3d at 1125–26. Indeed, though the district court held that Rule 410(a)(4) did not apply to statements made to law-enforcement officers, the court also considered whether Mullins's claim would succeed under *Lawrence*. *See Mullins*, 2022 WL 2306819, at *5. The court found "no evidence suggesting that ADA Ross had authorized police officials to make a plea agreement." *Id.*

Mullins has not shown that this factual finding was clearly erroneous.[10] *See Channon*, 881 F.3d at 809–10. Instead, he focuses on comparing his facts to

---

[10] In fact, Mullins does not challenge any of the district court's factual findings. *See* Op. Br. at 13.

*Serna*'s. But *Serna* is distinguishable. There, the defendant, his counsel, an AUSA, and two DEA agents met "to discuss the possibility of [the defendant's] cooperation with the Government." 799 F.2d at 848. The AUSA told the defendant that his statements "would not be used against him." *Id.* Then a DEA agent interviewed the defendant without the AUSA present. *Id.*

The Second Circuit concluded that Rule 11(e)(6)(D) protected the defendant's statements to the DEA agent. *Id.* at 849. It held that "[i]n light of the initial meeting with the AUSA, th[at] . . . discussion must be considered as part of the overall plea bargaining process." *Id.* The court also didn't think that the AUSA's absence from the meeting mattered. It explained that Rule 11(e)(6)(D) "require[s] the *participation* of a Government attorney in the plea discussions, but not necessarily his physical *presence* when a particular statement is made to agents whom the attorney has authorized to engage in plea discussions." *Id.* So because the DEA agent acted "under the AUSA's authority" when the defendant made the statements, the court concluded that Rule 11(e)(6)(D) applied. *Id.*

Here, no similar meeting occurred between Ross, Stout, and any officers. Instead, Stout and Ross—alone—discussed Woodall's body and the death penalty. *Mullins*, 2022 WL 2306819, at *2. Then a day later, without speaking to Ross, Stout and Mullins directed officers to the body. *See id.* Unlike in *Serna*, no officers were present or involved in the earlier discussion between

24

Stout and Ross. Simply put, no evidence supports that Ross authorized law-enforcement officers to negotiate a plea with Mullins. *See id.* at *5.

All that said, Mullins proposes another approach to Rule 410(a)(4)'s prosecuting-authority requirement. In his view, "[w]hether law enforcement agents were authorized to *negotiate* the terms of a plea deal with Mr. Mullins is . . . immaterial." Op. Br. at 18. He argues that "[w]hat matters" instead "is whether the plea deal that was the subject of Mr. Mullins' *discussions* with the prosecutor contemplated the provision of information to law enforcement."[11] *Id.*

This argument misses the mark. The court never found, nor does the record support, that Stout and Ross entered a "plea deal" during their discussion. Instead, the court noted that Ross merely "suggested" to Stout that he would not request the death penalty if Mullins revealed Woodall's location. *Mullins*, 2022 WL 2306819, at *2. And Stout never agreed to those terms during the meeting. In fact, Mullins wasn't even present for that discussion. The next day, Stout told police that Mullins would direct them to the body. *Id.*

---

[11] Mullins also argues that Rule 410(a)(4) protects his statements because he reasonably believed he made them during plea discussions. Though some courts have found a defendant's reasonable subjective belief relevant when deciding whether statements were made during plea discussions, *see, e.g.*, *United States v. Merrill*, 685 F.3d 1002, 1013 (11th Cir. 2012), we need not address that issue here. Whether or not Mullins reasonably believed he made his statements during plea discussions, he did not speak to someone with authority to negotiate a plea. *See Browning*, 252 F.3d at 1158 (concluding that the defendant's "reasonable subjective belief is an additional requirement for invoking Rule 11(e)(6)," separate from the prosecuting-authority requirement).

Yet as the district court emphasized, Stout knew whom to contact about a plea deal: Ross, not law-enforcement officials. *Id.* at \*5. And though Mullins highlights that Ross traveled with the caravan to Woodall's body, Ross's presence alone does not establish that he had entered a plea deal with Mullins.

All in all, when Mullins directed officers to Woodall's body, he had not entered a plea deal with Ross. Instead, any plea deal was still in the "discussions" stage. And so, for Rule 410(a)(4) to protect Mullins's statements, he had to be speaking with someone with "prosecuting authority." *See* Fed. R. Evid. 410(a)(4). He provides no evidence that he was.

Thus, the district court did not err in denying Mullins's suppression motion.[12]

## III.    Rule 16 Motion

Lastly, Mullins challenges the district court's denial of his motion to compel disclosure of communications between his prior counsel and the government.

### A.    Standard of Review

We review discovery decisions for abuse of discretion. *United States v. Muhtorov*, 20 F.4th 558, 629 (10th Cir. 2021). But Mullins argues that de novo

---

[12] Mullins also asks us to "import the fruit of the poisonous tree doctrine" to Rule 410(a)(4) and exclude all evidence derived from his statements. Op. Br. at 20 (citation modified). We need not address this issue because Rule 410(a)(4) does not protect his statements.

review applies because the communications' discoverability is a question of law.[13]

We disagree. Though we review de novo interpretations of the Federal Rules of Criminal Procedure, *United States v. Freeman*, 70 F.4th 1265, 1286 (10th Cir. 2023), Mullins challenges the court's *application* of Rule 16, not its interpretation of the rule. So we review the district court's decision for abuse of discretion. *See Muhtorov*, 20 F.4th at 629.

## B.    Analysis

Under Rule 16, a defendant may request—and the government must produce—documents or other items within the government's "possession, custody, or control" if "(i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1).

Mullins moved for production of communications between the government and his former counsel, Robert Gifford, because he feared Gifford disclosed attorney-client privileged information. The district court construed his motion as a Rule 16(a)(1)(E) discovery motion, reviewed the documents in

---

[13] Mullins cites *Craine,* 995 F.3d at 1153, to support this contention. *Craine* reviewed de novo the district court's application of the Sentencing Guidelines. *See id.* It says nothing about the standard of review for discovery decisions.

camera, and then denied the request. The court reasoned that the documents were not discoverable under Rule 16(a)(1)(E), nor did they show any inappropriate disclosures by Gifford.

Mullins now argues that Gifford's communications belonged to him as part of his client file, making them discoverable under Rule 16(a)(1)(E)(iii).

Even if the district court erred by denying Mullins's motion, that error was harmless.[14] *See* Fed. R. Crim. P. 52(a). Applying the nonconstitutional harmless error standard, we ask whether the error had "a substantial influence on the outcome of the trial" or leaves us "in grave doubt as to whether it had such effect." *United States v. Blechman*, 657 F.3d 1052, 1067 (10th Cir. 2011) (citation omitted).

Mullins never argued that he needed the documents for trial. Instead, he requested the communications because he believed they may support an ineffective-assistance claim. And regardless, the government's evidence of Mullins's guilt was overwhelming. *See United States v. Chavez*, 976 F.3d 1178, 1210 (10th Cir. 2020) (explaining that courts consider "the overall strength of the other evidence against the defendant" as part of the harmless-error analysis (citation omitted)). So we do not believe that the district court's discovery ruling substantially influenced the jury's verdict.

---

[14] Mullins argues that the government waived its harmless-error argument by not meaningfully briefing it. We disagree. The government adequately addressed harmless error in its response brief.

We also note that, in the district court, Mullins never requested the documents because they "belonged" to him; instead, he raised only ineffective-assistance concerns. And the court reviewed the documents with that in mind. Finding no improper disclosures, it denied the motion. But the court clarified that Mullins could still seek the records "for another purpose." R. vol. I at 426. This, too, supports that any error was harmless, because the court left open the door for other requests.

Mullins argues that we cannot review this issue for harmlessness because the communications are not in the record. But courts have applied harmless-error review to denied discovery motions before. *See, e.g.*, *United States v. Hodges*, 480 F.2d 229, 233 (10th Cir. 1973) (applying harmless-error analysis to "failure to require discovery"); *United States v. Sanders*, 106 F.4th 455, 475–76 (6th Cir. 2024) (en banc) (applying harmless-error analysis to denial of Rule 16(a)(1)(E) motion); *United States v. Owens*, 18 F.4th 928, 940–41 (7th Cir. 2021) (same). And Mullins provides no persuasive reason why we should change tack here. We therefore find this argument unconvincing.

## CONCLUSION

For these reasons, we affirm Mullins's convictions.